# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

Roosevelt Road Re, Ltd.,
Tradesman Program Managers, LLC,

        Plaintiffs,

v.

John Hajjar, MD,
Surgicare, LLC,
Surgicare of Manhattan, LLC,
Surgicare of Westside, LLC,
Surgicare, PC,
Boro Ventures, LLC,
Sovereign Medical Group, LLC,
Sovereign Management, LLC,
Regent Medical Properties, LLC,
Anthony DeGradi,
Wayne Hatami,
Feliks Kogan,
Leonid Tylman,
Gregg Rock,
Siddhartha Sharma, MD,
Surgicore, LLC,
Surgicore Management, Inc.,
Surgicore Management, LLC,
Surgicore 5th Avenue, LLC,
KTHD Investment, LLC,
NY Ortho Sports Medicine & Trauma, PC,
Jeffrey Stone Kaplan, MD,
Matthew P. Grimm, MD,
Adrian Puia, RPT,
Joseph Weinstein DO, PC,
Joseph Weinstein, DO,
University Orthopedics of New York, PLLC,
Steven John Touliopoulos, MD,
Charles A. DeMarco, MD,
Andrew M. Cruz, RPA,
Andrew Merola, MD,
Kolb Radiology, PC,
Thomas M. Kolb, MD,
Lenox Hill Radiology and Medical Imaging Associates, PC,

Case No.

**PLAINTIFFS DEMAND
TRIAL BY JURY**

---

Fogelgaren Forman & Bergman, LLP,
Eric Fogelgaren,
Jonathan Forman,
Robert Bergman,
Gorayeb & Associates, PC,
Christopher J. Gorayeb,
Francisco Payano,
Sisa Pakari Cultural Center Inc.,
Sisa Pakari Centro Cultural & Laboral, Inc.,
Fanny Guadalupe,
Rolando Manzano Moreno,
Cidel del Carmen Tandoza Moreno,

      Defendants.

---

## PLAINTIFFS ROOSEVELT ROAD RE, LTD. AND TRADESMAN PROGRAM MANAGERS, LLC'S ORIGINAL COMPLAINT

---

NOW COME PLAINTIFFS **ROOSEVELT ROAD RE, LTD.** (hereinafter referred to as "Roosevelt") and **TRADESMAN PROGRAM MANAGERS, LLC** (hereinafter referred to as "Tradesman") (hereinafter referred collectively to as "Plaintiffs") by and through their attorneys The Willis Law Group, LLC, allege as follows:

### I.

### NATURE OF THE ACTION

1.  Roosevelt is a foreign Bermuda-based limited company which sues herein in its capacity as reinsurer which underwrites policies and pertinently provides reinsurance that covers the claims at issue sufficient to constitute a party directly and ultimately damaged by the racketeering enterprises set forth herein.

2.      Tradesman is a limited liability company established in  and resident of New York, which sues herein as its own capacity and as managing general agent to Roosevelt, and tertiarily in similar capacity with respect to Accredited Surety and Casualty Company, Inc. (hereinafter referred to as "Accredited"), pursuant to its contractual authority and fiduciary obligation to bind, issue and collect premiums on policies as well as manage all aspects of claims allegedly arising under any such policy.

3.      This action seeks to recover money fraudulently obtained and sought to be obtained from Roosevelt and from costs incurred by Tradesman to identify and counteract Defendants'[1] fraudulent enterprises, as well as significant damage to Tradesman's business itself, through systematic exploitation of the New York State Workers' Compensation system, via submission of bills and purported supporting documentation by physical or electronic mail pertaining to alleged workplace accidents and purported medical treatment thereafter, patterns of alleged injury and treatment that were ultimately designed to result in windfall tort claims alleging violations of sections 240 and 241 of New York's Labor Law. This pattern defines the overarching enterprise scheme (hereinafter referred to as "Overarching Enterprise") at issue herein, which ultimately encompasses considerably more than the four specific claims identified and addressed herein.

---

[1]      Hereinafter the following are referred collectively to as "Defendants": John Hajjar, MD, Surgicare, LLC, Surgicare of Manhattan, LLC, Surgicare of Westside, LLC, Surgicare, PC, Boro Ventures, LLC, Sovereign Medical Group, LLC, Sovereign Management, LLC, Regent Medical Properties, LLC, Anthony DeGradi, Wayne Hatami, Feliks Kogan, Leonid Tylman, Gregg Rock, Siddhartha Sharma, MD, Surgicore, LLC, Surgicore Management, Inc., Surgicore Management, LLC, Surgicore 5th Avenue LLC, KTHD Investment, LLC, NY Ortho Sports Medicine & Trauma, PC, Jeffrey Stone Kaplan, MD, Matthew P. Grimm, MD, Adrian Puia, RPT, Joseph Weinstein, DO, PC, Joseph Weinstein, DO, University Orthopedics of New York, PLLC, Steven John Touliopoulos, MD, Charles A. DeMarco, MD, Andrew M. Cruz, RPA, Andrew Merola, MD, Kolb Radiology, PC, Thomas M. Kolb, MD, Lenox Hill Radiology and Medical Imaging Associates, PC, Fogelgaren Forman & Bergman, LLP, Eric Fogelgaren, Jonathan Forman, Robert Bergman, Gorayeb & Associates, PC, Christopher J. Gorayeb, Francisco Payano, Sisa Pakari Cultural Center Inc., Sisa Pakari Centro Cultural & Laboral, Inc., Fanny Guadalupe, Rolando Manzano Moreno, Cidel del Carmen Tandoza Moreno

4. As set forth by the Affidavits of Joyce deCastro, attached hereto as Exhibits A-1, A-2, A-3, and A-4, and incorporated herein by reference, submission of said bills via electronic means has further already resulted in payments being issued via the United States Postal Service and/or electronically utilizing the Automated Clearing House (ACH) via Electronic Funds Transfer (EFT) as set forth by Exhibits B-1, B-2, B-3, and B-4, attached hereto and incorporated herein by reference.

5. The associations in fact are not entirely congruent across claims, and each claim set forth herein constitutes its own distinct enterprise (hereinafter referred to as "Claimant Enterprise") for purposes of the Racketeer Influenced and Corrupt Organizations Act, maximized to benefit the aforementioned Defendants individually and collectively by establishing the claim and implementation of the fraudulent protocol for each claimant and thereafter receiving payments irrespective of the claimant's actual medical condition or lack thereof.

6. However, the claimants (hereinafter referred to as "Enterprise Claimants" or "Claimants") are not named as Defendants herein as – in marked contrast to the enterprises' participants – there is no verifiable indication that any claimant has in fact exerted any control over their putative claims, much less the requisite "some part in directing the enterprise's affairs." *Reves v. Ernst & Young*, 507 U.S.170, 179 (1993).

7. Specifically, Plaintiffs possess the founded belief that the Claimants and others similarly situated are targeted in part due to their lack of sufficient proficiency in the English language and correlating reliance upon those who prey upon them, including but not limited to Defendants identified herein and those not yet named.

8. The claims at issue arise from largely unwitnessed, and in many cases belatedly reported, alleged incidents in which the Claimants either were treated and released from emergency

care facilities with minor complaints or where they did not actually proceed to hospitals proximate to the alleged date of incident.

9.      The Claimants themselves are uniformly foreign-born individuals who may have obtained fraudulent identification documents, and who typically utilize multiple names or variations thereof and/or addresses in the course of their employment, claim filing, and alleged treatment.

10.     This calculated pattern is intended to deprive Tradesman and the various entities for which it provides essential services of the ability to timely locate and surveil the claimants prior to the implementation of fraudulent treatment protocols that are designed to mimic legitimate courses of treatment. When Tradesman has been able to do so, the surveillance video has stood in sharp opposition to the claimed injuries and treatment.

11.     The Fraudulent Treatment Protocol involves:

a.      initial examinations that are not legitimately performed to determine the true nature and extent of patient injuries, but rather are performed, if at all, as a pretext to report substantially similar, and in some instances nearly identical, examination findings to justify a variety of unnecessary treatment and services;

b.      prematurely obtained radiographic imaging, whose reports are used to retroactively justify the allegation that any and all listed positive findings resulted from the alleged incident, after which the alleged treatment will facially relate to same;

c.      a treatment plan of purported conservative care that consists entirely of billing and treatment notes that vaguely assert that the treatment is more than passive palliative care in nature, but which upon scrutiny fail to identify either any alleged therapeutic exercises or set forth the specific body part(s) allegedly being so treated;

d.      alleged evaluations that use the pretextual alleged failure of conservative treatment to justify medically unnecessary injections and surgeries, which are overwhelmingly purportedly performed at certain ambulatory surgery centers which thereby routinely collect immense amounts of money in the form of facility fees authorized by the New York State Workers' Compensation Medical Fee Schedule, which was designed to reimburse facilities for necessary procedures;

e.      submitting documents to Tradesman – and more importantly to the New York State Workers' Compensation Board – falsely representing that the examinations, treatment, tests, injections, and surgeries purportedly rendered were medically necessary when, in fact, they were either not performed or were performed to exploit the Claimants' compensation claims and thereafter result in a windfall to their tort attorneys.

12.      The Fraudulent Treatment Protocol was rendered by an immense network of providers, including:

a.      ambulatory surgery centers – John Hajjar, MD and his "Surgicare" network, Anthony DeGradi, Wayne Hatami, Feliks Kogan, and Leonid Tylman, along with Gregg Rock, in their "Surgicore" ring, as well as through complex series of limited liability companies purporting to provide realty, management, anesthesia and other services as set forth below;

b.      medical doctors individually and as putative owners of their professional corporations, who submit alleged evaluations and re-evaluations uniformly recommending injections and surgeries to benefit other parties to the fraud rather than being medically necessary – Jeffrey Stone Kaplan, MD, individually and as owner of NY Ortho Sports Medicine &Trauma PC ("NY Ortho"), Matthew P. Grimm, MD of NY Ortho,

Steven John Touliopoulos, MD individually and as owner of University Orthopedics of New York, PLLC ("University Orthopedics"), Joseph Weinstein, DO, individually and as owner of Joseph Weinstein, DO, PC, d/b/a Comprehensive Orthopedic & Spine Care ("Weinstein"), Charles A. DeMarco, MD, and Andrew M. Cruz, RPA, of University Orthopedics, and Andrew Merola, MD, along with the other physicians and healthcare providers who purportedly performed services in furtherance of the scheme as employees of the foregoing;

      c.    physical therapists working for the medical doctor defendants – most notably Adrian Puia, RPT of NY Ortho;

      d.    diagnostic facilities who provided various services including purported MRIs, EMG/NCV and/or laboratory testing – Thomas M. Kolb, individually and as owner of Kolb Radiology, PC, and Lenox Hill Radiology and Medical Imaging Associates, PC.

13.    Defendants' scheme began at some point prior to 2018 and has continued uninterrupted since that time.

14.    Due to Defendants' overarching scheme, Roosevelt has progressively incurred general liability claim adjustment expenses rising from $14,020,890.00 in 2018 to $36,362,147.00 in 2019, to $58,694,694.00 in 2020, to $91,334,395.00 in 2021 and $142,127,559.00 in 2022.

15.    Between 2021 and 2022 alone, Roosevelt's net outstanding liability under general liability reinsurance increased from $81,267,474.00 to $119,069,641.00, an increase of nearly 47% notwithstanding the COVID-19 pandemic during 2020, which led to the single largest one-year decline for the construction industry in New York City since 1990. *See* Office of the New York State Comptroller, "The Construction Industry in New York City: Recent Trends and Impact of

COVID-19," March 3, 2022, at 3. *See* https://www.osc.ny.gov/files/reports/osdc/_pdf/report-3-2021.pdf, incorporated herein by reference, last accessed February 15, 2024.

16.     The drastically escalating cost of construction-related claims in both the Workers' Compensation and general liability areas stands in marked contrast to the overall decreasing number of workplace accidents, which in New York City reportedly decreased from 759 in 2018 to 554 in 2022. *See e.g.,* "2022 New York City Construction Safety Report," at https://www.nyc.gov/assets/buildings/pdf/con_safe_2022.pdf, incorporated herein by reference, last accessed February 15, 2024.

17.     As a result of this scheme, Tradesman has incurred damages of more than $1 million and the loss of substantial business when one of its significant general liability carrier clients, Accredited, ceased to write insurance policies in the State of New York due to the cumulative toll taken by this fraudulent pattern. Tradesman has therefore suffered significant injury to its property in the form of moneys paid on as part of the fraudulent scheme, and further to its business, due to the cessation of insurance carrier(s) writing Workers' Compensation and/or general liability policies in the State of New York, thereby rendering it impracticable for Tradesman to continue providing the services to which it was contracted but for the fraudulent scheme at issue herein.

18.     Tradesman was subsequently forced to stop binding Workers' Compensation policies, since when workers' compensation claims exceed the amount of premium paid, the insurer pays the excess amount. As the fraudulent enterprises are designed to maximize payments to allegedly injured workers, the claims routinely exceed the amounts of premiums paid, and the insurer with whom it worked elected to remove itself from the market rather than incurring costs far above the amounts gained by writing the policies.

19.    Tradesman did not have any notice of the existence, much less the overarching nature of the fraudulent pattern of claims and treatment until 2020, roughly 18 months after Workers' Compensation Board hearings began to be conducted virtually. Tradesman identified its overall Workers' Compensation payouts increasing exponentially, followed in turn by a significant increase in tort claims alleging various workplace-related 'violations' as the cause of purported injury, with attendant ramifications for exposure by reinsurers, including but not limited to Roosevelt.

20.    As a reinsurer, Roosevelt "is not responsible for providing a defense, for investigating the claim or for attempting to get control of the claim in order to effect an early settlement [which] are the sole responsibility of the primary insurer". *Unigard Sec. Ins. Co. v. North River Ins. Co.*, 79 N.Y.2d 576, 583 (1992).

21.    Accordingly, Roosevelt had no notice of fraudulent activity until Tradesman identified the potential pattern and began its review and investigation in late 2020. However, due to potential statistical anomalies stemming from the COVID-19 pandemic, necessary data could not begin to be adequately compiled and analyzed until the third quarter of 2022.

22.    In addition to the healthcare providers who are inextricably involved in the enterprises herein, further Defendants consist of law firms and their attorneys who are materially intertwined with the defendant healthcare providers' alleged treatment and diagnoses, and thereafter actively prosecute the fraudulent claims before the Workers' Compensation Board and/or through the filing of multimillion-dollar tort claims that effectively utilize the alleged care and treatment obtained and paid for to construct facially viable tort claims with windfall recoveries.

23.    Upon information and belief, for at least the past 10 years, Defendant law firm Gorayeb & Associates, PC (hereinafter referred to as "Gorayeb PC") has been specifically utilizing

OSHA training courses to preemptively and unlawfully solicit new clients in violation of applicable New York regulations, specifically 22 N.Y.C.R.R. § 1200 Rule 7.3.

24.     Gorayeb PC has done so under the guise of its sponsorship and partnership with Defendant Fanny Guadalupe ("Guadalupe") and her organizations, Defendant Sisa Pakari Cultural Center, Inc. and Sisa Pakari Centro Cultural & Laboral, Inc. (hereinafter referred collectively to as "Sisa Pakari"). These ostensibly non-profit entities, have conducted Gorayeb-sponsored Spanish-language OSHA courses and thereby created the pipeline necessary for the overall enterprise and each individual enterprise to exist and continue by effectively directing how the claims are reported and the course of alleged care and treatment.

25.     The courses of treatment directed by these entities are done not for the benefit of the claimants, but to maximize recoveries by the Defendants herein, both individually and collectively.

26.     While all claims herein and others similarly undertaken reflect an overarching scheme, each claim constitutes a separate and independent union of individuals and entities associated in fact to improperly profit off of that specific alleged claim, sufficient to constitute an independent enterprise.

27.     Every individual enterprise is ongoing and has remained continuous over a substantial period. The commonality of the predicate acts, the fraudulent treatment protocols, and racketeering activity underscores the clear and present threat of repetition.

28.     The remaining Defendants are limited liability companies and other incorporated entities owned and/or controlled by Defendants who are actively furthering these enterprises and the overarching scheme, and represent additional property obtained through the fraudulent activity herein.

29.     Defendants herein have not only preyed upon the claimants in order to carry out these enterprises but have specifically exploited favorable New York State laws to benefit Defendants in New York and New Jersey.

30.     As a matter of public knowledge, New York State's Workers' Compensation Law "was designed to provide a swift and sure source of benefits to the injured employee or to the dependents of the deceased employee" in return for "the loss of the common-law tort action in which greater benefits might be obtained." *Liberty Mut. Ins. Co. v. Hurlbut*, 585 F.3d 639, 641 (2d Cir. 2009) (quoting *O'Rourke v. Long*, 41 N.Y.2d 219, 222 (1976)).

31.     In order to ensure that workers would receive treatment, the New York State legislature established the presumption that, in the context of any Workers' Compensation claim, unless a carrier could demonstrate substantial evidence to the contrary, *inter alia* "[t]he claim comes within the provision of this chapter" and "[t]hat sufficient notice thereof was given". New York Workers' Compensation Law § 21, subsections 1 and 2, respectively.

32.     In turn, "[w]ith respect to a board determination that a particular injury was or was not sustained in the course of employment, the judicial appellate function is limited." *O'Rourke*, *supra*, at 227.

33.     Given the strong presumption in favor of claims, "[i]t has been estimated that more than 90% of employee claims for benefits under the standards provided by the WCL are paid without contest." *Hurlbut*, *supra*, at 642 (citing Martin Minkowitz, New York Practice Series: New York Workers' Compensation § 15:1, at 594 (2003)).

34.     As Defendant Gorayeb PC's unlicensed investigator Francisco Payano (hereinafter referred to as "Payano") informed a Sisa Pakari class meant to receive OSHA training, on December 4, 2022, following an alleged incident at the job site, "if you go in an ambulance, the

boss cannot deny that the accident happened on the job ….[f]rom the moment that ambulance arrives at compensation, right away that will get approved in a couple of months." Exhibit D-1, December 4, 2022 OHSA class, Transcription, English Translation, at p. 3, attached hereto and incorporated herein by reference.

35.     As noted, however, "an adjudication by the board that there was a relationship between accident and employment, unless reversed on a direct appeal, would preclude any recovery in a civil action against the employer." *O'Rourke*, *supra*, at 227.

36.     As set forth *infra*, the grooming phase of the enterprises relies heavily on the fact that the Workers' Compensation claim provides the means of facially establishing causality and facially developing a treatment record, its barrier against tort claims has been fatally eroded with respect to construction workers.

37.     As Defendant Gorayeb PC's unlicensed investigator Payano informed a Sisa Pakari class meant to receive OSHA training, on December 4, 2022, "[c]onstruction workers are the only workers, 99% of the time, they are the only ones that can, let's say, have a lawsuit at the time of the accident, okay? Why? Because construction workers can sue the owner of the building and the general contractor, okay?" Exhibit D-1, December 4, 2022 OHSA class, Transcription, English Translation, at p. 7, attached hereto and incorporated herein by reference.

38.     In all four enterprises detailed herein and in the additional claims demonstrating the same pattern, Gorayeb PC alleged violations of sections 200, 240(1) and 241(6) of New York State's Labor Law, amplified by Bills of Particulars that tied these statutory sections with alleged violations of the Industrial Code as well as OSHA regulations. 29 C.F.R. § 1926 *et seq*.

39.     More specifically, as Payano explained to students on December 4, 2022, "why do construction workers have lawsuits? Because labor laws were violated when the accident

happened." Exhibit D-1, December 4, 2022 OHSA class, Transcription, English Translation, at 8, attached hereto and incorporated herein by reference.

40.     After detailing how to document alleged scaffolding and ladder claims – distinguishing those from hallway or stair slip and falls where photographs are to be taken – Payano explained the remaining category, namely that "[f]or a lawsuit there must be fall, some material falling on the parson's head or on another body part, that is a lawsuit." *Id.* at 8-9.

41.     The particularly useful legal principle to which Payano was referring was "Labor Law § 240(1), often called the "scaffold law," [which] governs "elevation-related safety measures," and imposes a statutory duty on owners, contractors, and their agents to make safety devices that provide "proper protection" available to their workers." *Hernandez v. GPSDC (New York) Inc.*, 2006 U.S. Dist. LEXIS 9172 at 26 (S.D.N.Y. March 9, 2006).

42.     While the scaffold law was originally established to protect workers engaged in activity rendered particularly dangerous due to significant height differential, New York courts have "[t]here is no bright-line minimum height differential that determines whether an elevation hazard exists." *Thompson v St. Charles Condominiums*, 303 A.D.2d 152, 154 (1st Dept. 2003*), lv. dismissed,* 100 N.Y.2d 556 (2003).

43.     As importantly, "[t]he failure to provide a safety device is a per se violation of the statute for which an owner/contractor is strictly liable." *Auriemma v. Biltmore Theatre, LLC*, 82 A.D.3d 1, 4 (1st Dept. 2011) (citing *Zimmer v. Chemung Co. Performing Arts*, 65 N.Y.2d 513, 523-524 (1985)).

44.     Accordingly, each enterprise herein, further claims demonstrating the same pattern, and countless others are most easily predicated on pre-identifying claimants whose Workers' Compensation claims can be managed to maximize payments to providers and ambulatory surgery

centers in the short term, even as the claims are crafted to fall into what amount to strict liability 'violations' to be asserted against general contractors and building owners in order to reap windfalls for all attorneys involved in the ensuing tort actions.

45.     Submission of the Workers' Compensation claim documents – which is done electronically per directive of the New York State Workers' Compensation Board – are intended to and do result in payments issued by mail and/or by EFT transfer utilizing the federal ACH, and therefore constitute predicate acts of willful fraud from which each enterprise proximately derives.

46.     By Congressional intent, "proximate cause "is generous enough to include the unintended, though foreseeable, consequences of RICO predicate acts," including, in some instances, harms that flow from, or are derivative of, each other. *Diaz*, 420 F.3d at 901 (citing *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 342-47 (1928) (Cardozo, C.J.)." *Horn v. Med. Marijuana*, 80 F.4th 130, 138 (2nd Cir. 2023), italicization in the original).

47.     Some of the categories of damages are documented by Exhibits A-1, A-2, A-3, and A-4, coupled with Exhibits B-1, B-2, B-3, and B-4 attached hereto and incorporated herein by reference, being the respective Workers' Compensation payments and costs incurred to identify and respond to the fraudulent activities detailed herein. The remaining damage to which Roosevelt is exposed in the general liability context is calculated by reference to application of New York State Verdicts and Settlements data to the alleged claims herein, specifically the Labor Law and Industrial Code sections allegedly violated, correlated with the injections and surgeries allegedly underwent as putative result of the claims, the exact amount to be determined at trial.

48.     With respect to damages in the general liability litigation settlement context, the injections and surgeries performed are conservatively calculated to average $1.5 million on the

low settlement side with the median settlement calculated to average $2 million per claim, the exact amount to be determined at trial.

49.     While Labor Law actions like these do not typically reach a jury verdict for reasons set forth herein, the average such exposure for these claims and others facially similar in terms of alleged treatment, injections and surgery has been calculated to average $5 million per claim, with potential upward modifiers not presently calculable as they would necessarily be atypical in reaching that stage in the normal course of litigation.

## II.

## JURISDICTION AND VENUE

50.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under 18 U.S.C. § 1961 *et seq*. ("RICO") because they arise under the laws of the United States.

51.     Pursuant to 28 U.S.C. § 1367, this Court also has supplemental jurisdiction over the state law claims because they are so related to the RICO claims as to form part of the same case and controversy, in this case each enterprise deriving from the predicate acts from which this action is derived.

52.     18 U.S.C. § 1965(a), this Court has jurisdiction since more than one Defendant "resides, is found, has an agent, or transacts business" in this district, and substantial events took place within this district.

53.     Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in this district since a substantial part of the events giving rise to this action occurred within this district.

54.     Pursuant to 28 U.S.C. § 1391(b)(3), venue is further proper in this district since a plurality of Defendants are known to reside in this district, and specifically in that key Defendants

in the form of Surgicore entities' owners Anthony DeGradi and Wayne Hatami, as well as Regina Moshe, titular owner of the CitiMed entities, maintain residences on Long Island proximately located near this court. As set forth below, additional defendants own real property or maintain places of business within the Counties of Nassau and/or Suffolk, New York.

55.    The remainder of Defendants are located in multiple states, including New York, New Jersey, and Florida. The ends of justice are therefore best met by maintaining this action where a plurality of key defendants reside, which is further where a substantial part of the events at issue have occurred and continue.

## III.
## PARTIES

### A.    Plaintiffs

56.    Tradesman is a limited liability company organized and principally located in the State of New York.

57.    Tradesman's primary business is to serve as a management general agency that provides specialized management services that pertinently include general liability and workers' compensation services from underwriting through claims handling and subsequent administrative and legal actions.

58.    Tradesman specifically focuses on safety management and effective claims handling with respect to clients within the construction industry, encompassing in different respects Workers' Compensation claims and general liability claims.

59.    As stated *supra* and expanded upon below with respect to the enterprises set forth herein, Tradesman has been materially damaged in excess of $1,000,000 (one million dollars) as

the result of Defendants' pattern of racketeering, specifically the result of payments it has issued, *see, e.g.* Exhibits A-1, A-2, A-3, and A-4, coupled with Exhibits B-1, B-2, B-3, and B-4 hereto and incorporated by reference, as a direct result of the tides of fraudulent billing submitted by Defendants via mail and/or electronic means to the New York State Workers' Compensation Board as well as to Tradesman and its clients directly, and further by the fraud-prompted decision of its long-time client Accredited, for whom it brings this suit as managing general agent, to cease issuing general liability insurance policies in the State of New York, thereby causing direct and irreparable harm to its business through the loss of income in an amount exceeding $1,000,000.00 to be determined at trial.

56.     In its capacity as managing general agent, Tradesman is authorized and obligated to bring this action pursuant to its contractual obligations following its discovery of a series of fraudulent claims, including the four enterprises detailed herein, on behalf of Roosevelt, a foreign limited company which is ultimately the damaged party in interest as the reinsuring entity liable to remit payment on claims herein.

57.     As set forth herein, Tradesman, individually and on behalf of Roosevelt, demonstrates an injury in fact both actual and imminent, a causal connection between the injury and conduct set forth, and the likelihood that a favorable decision will redress both actual and imminent injuries.

58.     Roosevelt is a foreign-based limited company which sues herein in its capacity as reinsurer which underwrites policies and pertinently provides reinsurance that covers the claims at issue sufficient to constitute a party directly and ultimately damaged by the racketeering enterprises set forth herein as stated in the section designated Nature of Action *supra*.

59.     As New York State's highest court has explained, "In a treaty reinsurance relationship, there is "1) no individual risk scrutiny by the reinsurer, 2) obligatory acceptance by the reinsurer of covered business, and 3) a long-term relationship in which the reinsurer's profitability is expected, but measured and adjusted over an extended period of time". *Mich. Nat'l Bank-Oakland*, 89 N.Y.2d 94, 106 (1996)(quoting Clark, *Facultative Reinsurance: Reinsuring Individual Policies,* reprinted in Reinsurance, at 121 [Strain ed. 1980]).

60.     Due to the ongoing and pervasive nature of Defendant's enterprises set forth herein and overall pattern of fraudulent activity, Roosevelt has been compelled to engage in overall risk scrutiny in order to protect the profitability it reasonably expected but for Defendants' activities.

**B.     Defendants**

    **1.   The Ambulatory Surgery Center Defendants**

        **a.   The Surgicare Enterprise.**

61.     John Hajjar, MD (hereinafter referred to as "Hajjar") is a physician licensed to practice in the State of New Jersey. Hajjar profited from fraudulent services allegedly performed on patients at various Ambulatory Surgery Center facilities owned directly or indirectly by him, including SCOB, LLC a/k/a "Surgicare Center of Brooklyn", Surgicare of Westside, LLC a/k/a "SOW", and Surgicare of Manhattan, LLC a/k/a "SOM".

62.     Dr. Hajjar has utilized a series of limited liability companies through which to control his various enterprises, including Boro Ventures LLC, which is the titular controlling owner of SCOB, LLC, yet has been defunct since 2020.

~~63.~~     Dr. Hajjar is also owner of Sovereign Medical Services, Inc. (hereinafter referred to as "Sovereign" a/k/a Sovereign Health System) and Regent Medical Properties (hereinafter referred to as "Regent"), as well as a myriad of specialized limited liability companies that were

created to control 13 properties in New Jersey, New York and Florida which obtained a $91.5 million dollar mortgage loan that in turn led to a guilty plea entered into by Regent's Chief Investment Officer Barton Schack in 2019 as the result of *United States v. Barton Schack*, as per the Information attached hereto as Exhibit E, attached hereto and incorporated herein by reference.

64.     The Schack Information referred to "Co-conspirator 1" as "the founder and chief executive officer of both Regent and Sovereign." *Id*.

65.     Dr. Hajjar has created several entities using varied combinations of the terms "Sovereign," "Medical," and "Health," including "Sovereign Health System," whose website identifies Dr. Hajjar as its "Founder, Chairman, and Chief Executive Officer." *See* Sovereign.Health/executive-team/#, incorporated herein by reference, last accessed February 28, 2024.

66.     Dr. Hajjar's "Sovereign Health System" enterprise lists six Surgicare facilities located in New Jersey. *See* Exhibit F, attached hereto and incorporated herein by reference.

67.     While separately formed, Dr. Hajjar's network of ambulatory surgery centers are essential components of the fraudulent treatment protocol at the core of this action, as are his associated "Surgicare Surgical Associates" limited liability companies that operate in tandem with his ambulatory surgery centers.

68.     Upon information and belief, Dr. Hajjar has utilized income derived from the fraudulent treatment protocol and the mail/wire fraud necessarily utilized in submitting bills to the Workers' Compensation Board in order to perpetuate and/or expand his enterprise, to the extent that his intertwined entities all profit from the fraudulent enterprise.

69.     Surgicare, LLC is formed and located in the State of New Jersey, and upon information and belief is ultimately controlled by Dr. Hajjar and operates as part of his ambulatory surgery center enterprise.

70.     Surgicare, P.C. is an ambulatory surgery center formed and located in the State of New York, and upon information and belief is ultimately controlled by Dr. Hajjar and operates as part of his ambulatory surgery center enterprise.

71.     Surgicare of Westside, LLC a/k/a "SOW" is an ambulatory surgery center formed and located in the State of New York, and upon information and belief is ultimately controlled by Dr. Hajjar and operates as part of his ambulatory surgery center enterprise, including specific claims at issue in this action as set forth below.

72.     Surgicare of Manhattan, LLC a/k/a "SOM" is an ambulatory surgery center formed and located in the State of New York, and upon information and belief is ultimately controlled by Dr. Hajjar and operates as part of his ambulatory surgery center enterprise, including specific claims at issue in this action as set forth below.

73.     Boro Ventures, LLC was a New York-registered domestic limited liability company controlled by Dr. Hajjar through which he created SCOB, LLC. Upon information and belief, this entity had its authorization revoked by New York State in 2020.

74.     Sovereign Medical Group, LLC (hereinafter referred to as "Sovereign Medical") is a New Jersey- registered entity through which Dr. Hajjar controls various entities, including ambulatory surgery centers and associated practices. This entity has profited from fraudulent services allegedly performed and from professional service corporations that allegedly rendered medical and services to patients.

75.     Sovereign Management, LLC (hereinafter referred to as "Sovereign Management") is a New Jersey-registered entity through which Dr. Hajjar controls various property management entities, which in turn relate to his ambulatory surgery centers and associated practices. This entity has profited from fraudulent services allegedly performed and from professional service corporations that allegedly rendered medical and services to patients.

76.     Regent Medical Properties, LLC (hereinafter referred to as "Regent") is a New Jersey-registered management company that provides management services to Dr. Hajjar's various properties and is an integral part of his overall enterprise. Dr. Hajjar is sole owner and shareholder of Regent.

### b.   Hajjar Enterprises as defined by 18 U.S.C. § 1962(c).

77.     In addition to those entities that directly participated in and furthered Claimant Enterprises herein, Defendant Hajjar's dozens of interconnected entities incorporated in New York, New Jersey, Delaware, Florida, and Pakistan, have been either acquired or maintained by Defendant Hajjar, and engage in interstate and/or international commerce, thereby violating the provisions of 18 U.S.C. § 1962(c).

78.     MD Vision CSD, LLC and MD Vision, LLC (hereinafter referred collectively to as "MD Vision") are limited liability corporations formed by Defendant Hajjar in the State of New Jersey in 2014, and operate facially as "a Sovereign Medical Services Company," specifically "a digital transformation services and software engineering organization providing personalized IT solutions that initiate business change for customers globally." *See* https://www.mdvision.net/about.html, incorporated herein by reference, last accessed February 29, 2024.

79.     MD Vision identifies its "Corporate Headquarter" [sic] as being located at 85 Harristown Road, Glen Rock, NJ 07452, which is home to Sovereign. *See* https://www.mdvision.net/contact.html, last accessed February 29, 2024.

80.     However, investigation conducted on Plaintiffs' behalf indicates that MD Vision is also incorporated as a limited company registered with Pakistan's Securities and Exchange Commission as MD Vision (Pvt Ltd.), specifically "Office No. 2 Building 2, The Enterprise 1-KM, Multan Road, Thokar Niaz Baif, Lahore". *See* https://www.hec.gov.pk/english/services/students/TDF/Documents/TDF%204th%20Calls%20Documents/Industry_list_corporate_class.xls, last accessed February 29, 2024.

81.     Formed in 2002 and based in Islamabad, HEC is "Higher Education Commission of Pakistan is an independent, autonomous, and constitutionally established institution of primary funding, overseeing, regulating, and accrediting the higher education efforts in Pakistan." See https://www.hec.gov.pk/english/aboutus/Pages/aboutus.aspx, last accessed February 29, 2024.

82.     The contact information for MD Vision on the Pakistani governmental document is listed as "info@mdvision.net," which is the website for the New Jersey-based entity, whose website does not acknowledge any foreign affiliate.

83.     Plaintiffs cannot determine the precise relationship between Defendant Hajjar's domestic and foreign-based enterprises, including but not limited to any transfer of assets or information either physically or electronically.

84.     Surgicare on the Hudson, LLC is an ambulatory surgery center formed and located in the State of New Jersey, and upon information and belief is ultimately controlled by Dr. Hajjar and operates as part of his ambulatory surgery center enterprise.

85.     Surgicare of Kinderkamack, LLC is an ambulatory surgery center formed and located in the State of New Jersey, and upon information and belief is ultimately controlled by Dr. Hajjar and operates as part of his ambulatory surgery center enterprise.

86.     Surgicare of Glen Rock, LLC is an ambulatory surgery center formed and located in the State of New Jersey, and upon information and belief is ultimately controlled by Dr. Hajjar and operates as part of his ambulatory surgery center enterprise.

87.     Surgicare of Freehold, LLC is an ambulatory surgery center formed and located in the State of New Jersey, and upon information and belief is ultimately controlled by Dr. Hajjar and operates as part of his ambulatory surgery center enterprise.

88.     Surgicare of Florham Park, LLC is an ambulatory surgery center formed and located in the State of New Jersey, and upon information and belief is ultimately controlled by Dr. Hajjar and operates as part of his ambulatory surgery center enterprise.

89.     Surgicare of Central Jersey, LLC is an ambulatory surgery center formed and located in the State of New Jersey, and upon information and belief is ultimately controlled by Dr. Hajjar and operates as part of his ambulatory surgery center enterprise.

90.     Surgicare Surgical Associates of Carlstadt, LLC (hereinafter referred to as "Surgicare Carlstadt") is a New Jersey-registered entity that provides medical services at its associated ambulatory surgery center, which and upon information and belief is ultimately controlled by Dr. Hajjar. This entity has profited from fraudulent services allegedly performed at the Surgicare facilities.

91.     Surgicare Surgical Associates of Englewood Cliffs, LLC (hereinafter referred to as "Surgicare Englewood") is a New Jersey-registered entity that provides medical services at its associated ambulatory surgery center, which and upon information and belief is ultimately

controlled by Dr. Hajjar. This entity has profited from fraudulent services allegedly performed at the Surgicare facilities.

92.     Surgicare Surgical Associates of Fairlawn, LLC (hereinafter referred to as "Surgicare Fairlawn") is a New Jersey-registered entity that provides medical services at its associated ambulatory surgery center, which and upon information and belief is ultimately controlled by Dr. Hajjar. This entity has profited from fraudulent services allegedly performed at the Surgicare facilities.

93.     Surgicare Surgical Associates of Jersey City, LLC (hereinafter referred to as "Surgicare Jersey City") is a New Jersey-registered entity that provides medical services at its associated ambulatory surgery center, which and upon information and belief is ultimately controlled by Dr. Hajjar. This entity has profited from fraudulent services allegedly performed at the Surgicare facilities.

94.     Surgicare Surgical Associates of Mahwah, LLC (hereinafter referred to as "Surgicare Mahwah") is a New Jersey-registered entity that provides medical services at its associated ambulatory surgery center, which and upon information and belief is ultimately controlled by Dr. Hajjar. This entity has profited from fraudulent services allegedly performed at the Surgicare facilities.

95.     Surgicare Surgical Associates of Oradell, LLC (hereinafter referred to as "Surgicare Oradell") is a New Jersey-registered entity that provides medical services at its associated ambulatory surgery center, which and upon information and belief is ultimately controlled by Dr. Hajjar. This entity has profited from fraudulent services allegedly performed at the Surgicare facilities.

96.     Surgicare Surgical Associates of Ridgewood, LLC (hereinafter referred to as "Surgicare Ridgewood") is a New Jersey-registered entity that provides medical services at its associated ambulatory surgery center, which and upon information and belief is ultimately controlled by Dr. Hajjar. This entity has profited from fraudulent services allegedly performed at the Surgicare facilities.

97.     Surgicare Surgical Associates of Wayne, LLC (hereinafter referred to as "Surgicare Wayne") is a New Jersey-registered entity that provides medical services at its associated ambulatory surgery center, which and upon information and belief is ultimately controlled by Dr. Hajjar. This entity has profited from fraudulent services allegedly performed at the Surgicare facilities.

98.     Hajjar MOB of Okeechobee, LLC (hereinafter referred to as "Okeechobee"), MMB Management Advisory Services, LLC (hereinafter referred to as "MMB"), Surgem Management of Florida, LLC (hereinafter referred to as "Surgem Florida"), Monarch Anesthesia of South Florida, LLC (hereinafter referred to as "Monarch"), Monarch Anesthesia Holdings of South Florida, LLC (hereinafter referred to as "Monarch Holdings"), are Florida corporations created to further Dr. Hajjar's various enterprises in Florida, including ownership and management of medical office properties and medical corporations, and anesthesia services. These entities have profited from fraudulent services allegedly performed at the Surgicare facilities.

99.     Dr. Hajjar is also sole owner of B & B Hajjar Investments LLC, which is the vehicle through which he owns – or has owned at relevant times – Hajjar Business Holdings, LLC; Hajjar Medical Office Building, LLC; Hajjar Medical Office Building of Carlstadt, LLC; Hajjar Medical Office Building of Hackensack Limited Liability Company; Hajjar Medical Office Building of Jersey City Limited Liability Company; Hajjar Warehouse of Hackensack Limited Liability

Company; Hajjar Medical Office Building of Fairlawn Limited Liability Company; Hajjar Medical Office Building of Glen Rock Limited Liability Company; Hajjar Medical Office Building of Wayne Limited Liability Company; Hajjar Medical Office Building of Roseland, LLC; Hajjar Medical Office Building of New Brunswick Limited Liability Company; Hajjar Medical Office Building of Mount Kisco, LLC; and Hajjar Office Building of Miramar, LLC, which are Delaware-incorporated and New Jersey-based entities aside from the last two above which are based in New York and Florida, respectively, all which purportedly managed his network of medical office buildings.

100.  Dr. Hajjar also is or was at relevant times the sole ultimate owner of the real properties on which his New Jersey office buildings (Hajjar Medical Office Buildings a/k/a "HMOBs") are situated:  HMOB Wayne Owner, LLC; HMOB of Oradell Owner, LLC; HMOB of Carlstadt Owner, LLC; HMOB of Hackensack Office Owner, LLC; HMOB of Hackensack Warehouse Owner, LLC; HMOB of New Brunswick Owner, LLC; HMOB of Roseland Owner, LLC; HMOB of Jersey City Owner, LLC; HMOB of Fair Lawn Owner, LLC; HMOB of Glen Rock Owner, LLC; HMOB of Fair Lawn 15-01 Broadway Owner, LLC; HMOB of Mt. Kisco Owner, LLC; HMOB of Miramar Owner, LLC, HMOB of Oradell Mezz, LLC, HMOB of Roseland Mezz, LLC, HMOB of Wayne Mezz, LLC, and MSC – Regent HMOB Holdco, LLC.

101.  Dr. Hajjar has further incorporated a series of limited liability companies in the State of Delaware, through which he owns and operates or has owned and operated similar enterprises consisting of ownership, management services, medical corporation tenants, and related services, active in multiple states, including but not necessarily limited to HMOB Plan Admin, LLC, HMOB Jersey City Parking, LLC, HMOB of Carlstadt Mezz, LLC, HMOB of Fair Lawn 15-01 Broadway Mezz, LLC, HMOB of Fair Lawn Mezz, LLC, HMOB of Glen Rock Mezz,

LLC, HMOB of Hackensack Office Mezz, LLC, HMOB of Jersey City Mezz, LLC, HMOB of Miramar Mezz, LLC, HMOB of Mt. Kisco Mezz, LLC, HMOB of New Brunswick Mezz, LLC,

### c. The Surgicore Enterprise.

102.   Anthony DeGradi (hereinafter referred to as "DeGradi") is a principal of various ambulatory surgery centers ultimately owned and controlled by "Surgicore," largely along with defendants Wayne Hatami, Feliks Kogan, and Leonid Tylman, either directly as equal partners and/or through secondary entities including Surgicore Management Inc. and Surgicore Management NY, LLC.

103.   DeGradi is a resident of Suffolk County, New York, and owns properties in Shoreham and Sound Beach, located in said County and proximate to the Courthouse located in Central Islip, New York.

104.   DeGradi is currently a defendant in an action commenced by Allstate Insurance Company (*Allstate Insurance Company et. al v. Lyons Medical, P.C. et. al*) which alleges that he unlawfully controlled medical corporations located in New York State as part of a RICO enterprise. *See* Exhibit G, attached hereto and incorporated herein by reference.

105.   DeGradi has been a named defendant in similar lawsuits, including *Farmington Cas. Co. v. Patchogue Open MRI, P.C.*, No. 2:22-CV-00999-HG-SIL (E.D.N.Y.); *GEICO v. Lyons Medical, P.C.*, No. 2:20-CV-2089-DRH-SIL (E.D.N.Y.); *Allstate Ins. Co. v. Mendoza*, No. 2:18-cv-04361-SJF-AYS (E.D.N.Y.); and *Allstate Ins. Co. v. Payne*, No. 2:18-CV-03972-SJF-GXB (E.D.N.Y.).

106.   Wayne Victor Hatami, RPT (hereinafter referred to as "Hatami") is a registered physical therapist licensed and resident of the State of New York, specifically Oyster Bay, located in Nassau County, New York.

107.    Hatami is a principal of various ambulatory surgery centers ultimately owned and controlled by "Surgicore," largely along with defendants DeGradi, Feliks Kogan, and Leonid Tylman.

108.    Feliks Kogan (hereinafter referred to as "Kogan") is, upon information and belief, a resident of the State of New York, with additional residences in the State of Florida.

109.    Kogan is a principal of various ambulatory surgery centers ultimately owned and controlled by "Surgicore," largely along with defendants DeGradi, Hatami, and Leonid Tylman.

110.    Leonid Tylman is, upon information and belief, a resident of the State of New York, and a principal of various ambulatory surgery centers ultimately owned and controlled by "Surgicore," largely along with defendants DeGradi, Hatami, and Kogan.

111.    Gregg Rock, DPM (hereinafter referred to as "Rock") is a podiatrist and resident of New York State. According to public disclosures, he is a part owner of defendant Fifth Avenue Surgery Center, LLC, though not an equal member of the core Surgicore enterprise.

112.    Siddhartha Sharma, DPT (hereinafter referred to as "Sharma") is a podiatrist and resident of New York State. He is Chief of Foot and Ankle Surgery at SurgiCore Surgical Center in Saddle Brook, New Jersey.

113.    The Surgicore ambulatory surgery centers in New York and New Jersey are essential components of the fraudulent treatment protocol at the core of this action, as they provide the situs for countless alleged injections and/or surgeries that form the culmination of the fraudulent treatment protocol.

114.    Without use of the ambulatory surgery centers for the unnecessary injections and surgeries, the fraudulent treatment protocol detailed herein would not result in windfall tort

recovery, which insofar as is relevant herein would result in settlement averages of $1.5 million - $2 million as noted *supra*.

115.    Upon information and belief, the Surgicore defendants have derived substantial income from the fraudulent treatment protocol and the mail/wire fraud necessarily utilized in submitting bills to the Workers' Compensation Board to perpetuate and/or expand their enterprise, to the extent that their intertwined entities all profit from the fraudulent enterprise, in addition to the repeatedly utilized facilities identified herein.

116.    Upon information and belief, the Surgicore defendants incorporate anticipated revenue derived from various fraudulent enterprises into their proposed operating budgets when seeking approval for the construction or purchase of ambulatory surgery centers.

117.    In 2017, Surgicore and its four principals submitted Project #171220-E to the New York Department of Health's Public Health and Planning Council, proposing to purchase a controlling 60% interest in Defendant Fifth Avenue Surgery Center, with an additional 24% interest in this facility going to Defendant Rock. *See* https://www.health.ny.gov/facilities/public_health_and_health_planning_council/meetings/2017-07-20/docs/exhibits.pdf, at p. 53 et seq. Last accessed February 29, 2024.

118.    The Surgicore Defendants' operating budget submitted to the Council pertinently including the following projected revenues (*id* at p. 58):

| Revenues | Current Year | Year One |
|---|---|---|
| Commercial FFS | $4,748,117 | $8,507,229 |
| Medicare FFS | 206,685 | 206,685 |
| Medicaid FFS | 210 | 50,436 |
| WC, Private Pay, No-Fault | 264,345 | 4,440,717 |
| Total Revenues | $5,219,357 | $13,205,067 |

119.   WC represents Workers' Compensation, while No-Fault represents services rendered pursuant to section 5100 and 5200 of the New York State Insurance Law in the form of Personal Injury Protection (PIP) and related automobile insurance policies.

120.   The projected revenue increase in those two statutorily mandated insurance can be expressed as a 1,565% increase, or an additional $4,4136,372 from the prior year.

121.   The proposal sought to explain the astonishing increase by referencing four new non-member physicians and the procedures they allegedly projected they would perform (*id*):

> An increase in utilization, expenses and revenues is expected based on historical performance and the proposed addition of four physicians to the Center.  Each of the four new non-member physicians have submitted a letter regarding the number surgical procedures they estimate they will perform annually at the Center, which totals 1,130 additional procedures in the first year.

122.   Plaintiffs cannot comment with respect to the anticipated additional revenue projected to have been received from other sources, but 1,130 additional procedures performed in a year would constitute a remarkable additional three per day on a 365-day calendar, or over four per day utilizing a five-day workweek calculation.

123.   These self-reported figures strongly appear to be indicative of the pre-selected pool of alleged claimants spanning fraudulent Workers' Compensation treatment as set forth herein, as well as similarly fraudulent schemes deriving from New York's Comprehensive Motor Vehicle Insurance Reparations Act and its PIP mandates.

124.   The entangled web that is the Surgicore enterprise is complicated by the extensive use of foreign funding through the "EB-5" visa program, specifically the East Coast Regional Center (hereinafter referred to as "ECRC") from which the Surgicore Defendants, via Defendant KTHD Investment, LLC obtained millions of dollars in foreign funding with which to expand their

network of ambulatory surgery centers. *See* Exhibit H, attached hereto and incorporated by reference.

125.    The EB-5 program, derived from its authorizing statute 8 U.S.C. § 1153(b)(5), was enacted in 1990, and was substantially unchanged until passage of the "EB-5 Reform and Integrity Act of 2022" (hereinafter, "2022 Act"), which increased the minimum investment from the foreign visa-seeker from $1,000,000.00 or $500,000.00 in regions designated as "Targeted Employment Areas" or TEAs to $1,050,000.00 and $800,000.00, respectively.

126.    The 2022 Act removed the ability of states to designate TEAs to reside exclusively within the Department of Homeland Security's U.S. Citizenship and Immigration Services (hereinafter referred to as "USCIS").

127.    Most pertinently for the purposes of this action, "[t]he 2022 Act includes a number of oversight measures, primarily targeted toward regional centers, that address concerns that had been raised about fraud and abuse in the program. It establishes an *EB-5 Integrity Fund*, funded by annual regional center fees ($20,000, or $10,000 for those with 20 or fewer investors) and $1,000 fees from each Immigrant Petition by Regional Center Investor filed." Straut-Eppsteiner, Holly, "Legislative Changes to the EB-5 Immigrant Investor Program," *Congressional Research Service*, updated July 26, 2023, at https://crsreports.congress.gov/product/pdf/IN/IN11989#:~:text=EB%2D5%20Reform%20and%20Integrity%20Act%20of%202022&text=The%20legislation%2C%20codified%20in%20Section,for%20investors%20and%20regional%20centers, incorporated herein by reference, last accessed February 27, 2024.

128.    Surgicore Ambulatory Surgery Centers have played a recurring role in the enterprise schemes detailed herein, while others have been purchased or operated utilizing income derived from the fraudulent schemes detailed herein.

129.     Surgicore, LLC a/k/a "Surgicore Surgery Center" is an ambulatory surgery center formed and located in the State of New Jersey, and is operated as a key element of the Surgicore ambulatory surgery center enterprise, including Claimant Enterprises detailed herein.

130.     Surgicore 5th Avenue, LLC (hereinafter referred to as "Surgicore 5th Avenue") is an ambulatory surgery center formed and located in the State of New York, and is operated as a key element of the Surgicore ambulatory surgery center enterprise, including Claimant Enterprises detailed herein.

131.     Surgicore Management, LLC is, upon information and belief, a New Jersey-registered entity utilized by the Surgicore defendants to purportedly manage properties and related entities.

132.     Surgicore Management, Inc. is, upon information and belief, a New Jersey-registered entity utilized by the Surgicore defendants to purportedly manage properties and related entities.

133.     KTHD Investments, LLC is a New Jersey-registered entity created by the Surgicore owners, utilizing an acronym of their names, Kogan, Tylman, Hatami, and DeGradi, through which the Surgicore enterprise has expanded by at least partially obtaining foreign investments through the EB-5 visa program through the East Coast Regional Center (hereinafter referred to as "ECRC"). *See* Exhibit H, attached hereto and incorporated by reference.

134.     As per the ECRC website,

> "KTHD Investment LLC is a professional ambulatory surgical center (ASC) operator established for the purpose of acquiring distressed performing surgery center facilities. It was founded by four partners, and has a dedicated team of professionals with over 20 years of experience in healthcare planning, project management and development. KTHD utilizes proven-successful business model to turn-around its acquiring surgical facilities.

> After the takeover of these centers, the management team expects to achieve not only substantially increased revenue but higher than industry-average rate of return for its equity owners. Their strategies have been implemented in successful acquisition and operation of three (3) Freestanding Ambulatory Surgery Centers in the state of New Jersey."

*See* https://ecrceb5.com/about-us/, incorporated herein by reference, last accessed January 18, 2024. *See also* Exhibit H, attached hereto and incorporated by reference.

135.    Surgicore Management, Inc. is, upon information and belief, a New Jersey-registered entity utilized by the Surgicore defendants to purportedly manage properties and related entities.

136.    The ECRC has been utilized by the Surgicore Defendants to raise $7.5 million from 15 foreign investors to develop an ambulatory surgery center in Queens, and an additional $6.5 million to acquire and operate ambulatory surgery centers in New Jersey and "Manhattan Fifth Avenue of New York City." *See* https://ecrceb5.com/ecrc-projects/, incorporated herein by reference, last accessed February 27, 2024.

137.    ECRC Group M-2 LLC is a New York limited liability company with an address of 3 School Street Suite 303, Glen Cove, New York 11542. New York State public Uniform Commercial Code documents indicate that on March 8, 2023, ECRC Group M-2 LLC submitted a financing statement that identifies Defendants DeGradi, Hatami and Kogan as debtors. *See* NY UCC File No. 202303088102525, incorporated herein by reference.

138.    Upon information and belief, the reference to a 'distressed' Fifth Avenue ambulatory surgery center may be to Defendant Fifth Avenue Surgery Center, LLC, which has in turn played a key role in furthering the overarching enterprise and specific Claimant Enterprises as set forth below.

139.    Upon information and belief, the reference to a Queens ambulatory surgery center is to NYEEQASC, LLC, which has been a named defendant in at least 73 declaratory judgment actions filed by automobile insurance carriers and self-insurers in New York State court between 2019 and the present.

### d.  Surgicore Enterprises as defined by 18 U.S.C. § 1962(c).

140.    In addition to those entities that directly participated in and furthered Claimant Enterprises herein, the Surgicore Defendants' known interconnected entities primarily incorporated in New York and New Jersey directly benefit from the fraudulent enterprise, and engage in interstate and/or international commerce, thereby violating the provisions of 18 U.S.C. § 1962(c).

141.    Surgicore of Jersey City, LLC a/k/a "Surgicore Jersey City" is an ambulatory surgery center formed and located in the State of New Jersey, and is operated as a key element of the Surgicore ambulatory surgery center enterprise.

142.    Surgicore Mahwah ASC Holdings, LLC (hereinafter referred to as "Surgicore Mahwah") is an ambulatory surgery center formed and located in the State of New Jersey and is operated as a key element of the Surgicore ambulatory surgery center enterprise.

143.    New Horizon Surgical Center, LLC (hereinafter referred to as "New Horizon") is an ambulatory surgery center formed and located in the State of New Jersey and is operated as a key element of the Surgicore ambulatory surgery center enterprise.

144.    Manalapan Surgery Center, LLC (hereinafter referred to as "Manalapan Surgery") is an ambulatory surgery center formed and located in the State of New Jersey, and is operated as a key element of the Surgicore ambulatory surgery center enterprise.

145.     Bronx SC, LLC, d/b/a Empire State Ambulatory Surgery Center, is an ambulatory surgery center formed and located in the State of New York, operated as a key element of the Surgicore ambulatory surgery center enterprise, and controlled by Surgicore 5th Avenue.

146.     All City Family Healthcare Center, Inc. (hereinafter referred to as "All City") is an ambulatory surgery center formed and located in the State of New York and is operated as a key element of the Surgicore ambulatory surgery center enterprise.

147.     NYEEQASC, LLC (hereinafter referred to as "Queens Surgery Center") is an ambulatory surgery center formed and located in the State of New York, and is operated as a key element of the Surgicore ambulatory surgery center enterprise.

148.     Surgicore RSBC, LLC a/k/a Rockland and Bergen Surgery Center (hereinafter referred to as "RSBC") is an ambulatory surgery center formed and located in the State of New York, and is operated as a key element of the Surgicore ambulatory surgery center enterprise.

149.     Rockaways ASC Development, LLC, d/b/a ASC of Rockaway Beach (hereinafter referred to as "Rockaways") is an ambulatory surgery center formed and located in the State of New York, and is operated as a key element of the Surgicore ambulatory surgery center enterprise.

150.     Defendant DeGradi is or has been at relevant times the registered agent for service of process and believed to be at least a partial owner in additional New York State-registered entities, utilizing Patchogue and Sound Beach (Suffolk County, NY) addresses, including KDH Consulting Group, LLC; 192 E. Shore Rd Realty LLC; Xterra Contracting, Inc.; WAFI 45-01 Realty LLC; Surgicore Great Neck, LLC; 29 Barstow Realty LLC; WHAD Consulting Corp.; Weekend Warriors, Inc.; Xterra Tree Service Inc.; JAVS Ventures, Inc.; PB & Goose, LLC, Jamesport Equities, LLC; HPG JPC Ventures, LLC; Studio of Trillions, LLC; Accelerator of Trillions, LLC; and EV SPV 1, LLC.

## 2. Medical Provider Defendants

### a. NY Ortho Sports Medicine & Trauma, PC

151.    NY Ortho Sports Medicine & Trauma, PC (hereinafter referred to as "NY Ortho") is a professional corporation registered in the State of New York. This entity has profited from fraudulent services allegedly performed by its personnel and has directly furthered the implementation of the fraudulent treatment protocol by allegedly evaluating claimants and thereafter claiming to provide conservative care then utilized to justify unnecessary procedures including injections and surgeries.

152.    Jeffrey Stone Kaplan, MD (hereinafter referred to as "Kaplan") is a physician licensed to practice medicine in the State of New York, and a principal of NY Ortho.

153.    Kaplan owns real estate in East Hampton, which is in Suffolk County New York, proximate to this Court.

154.    Kaplan knowingly profited from alleged medical and diagnostic services rendered as part of the NY Ortho enterprise, including determining the services to be allegedly performed and orchestrating the submission of fraudulent claims for healthcare services.

155.    Kaplan materially contributed to the fraudulent treatment protocol by: a) allegedly evaluating claimants; b) referring claimants largely to his colleagues, defendants Matthew Grimm, MD and Adrian Puia, RPT for unnecessary injections and unperformed 'physical' therapy; c) by performing surgeries that were medically unnecessary and/or not causally related to the alleged workplace incidents; and d) by directing claimants to undergo procedures at Roosevelt Surgery Center, d/b/a Manhattan Surgery Center, in which he owns an interest.

156.   Matthew Paul Grimm, MD ("Grimm") is a physician licensed to practice medicine in the State of New York.

157.   Grimm knowingly profited from alleged medical and diagnostic services rendered as part of the NY Ortho enterprise, including determining the services to be allegedly performed and orchestrating the submission of fraudulent claims for healthcare services.

158.   Grimm materially profited from and furthered the fraudulent scheme by purporting to evaluate claimants upon referral from his colleague and coconspirator Kaplan, and/or thereafter performing injections and other procedures that were medically unnecessary and/or not causally related to the alleged workplace incidents.

159.   Adrian Puia, RPT (hereinafter referred to as "Puia") is a physical therapist licensed to practice in the State of New York. Puia profited from alleged physical therapy services rendered as part of the NY Ortho enterprise, utilized to justify purported failure of conservative care that was not in fact provided, and knowingly participated in the submission of fraudulent claims for healthcare services.

160.   Individually and in concert, these individuals knowingly participated in fraudulent purported evaluations and treatment with the intent to subject claimants to medically unnecessary injections and surgeries in order to further the fraudulent enterprise.

161.   Individually and in concert, these individuals knowingly participated in fraudulent statements that the alleged injuries were causally related to alleged workplace incidents in order to further the fraudulent enterprise.

### b.  University Orthopedics of New York, PLLC

162.   University Orthopedics of New York, PLLC (hereinafter referred to as "University") is a professional limited liability company registered in the State of New York. This entity has profited from fraudulent services allegedly performed by its personnel and has directly furthered the implementation of the fraudulent treatment protocol by allegedly evaluating claimants and thereafter performing unnecessary procedures including injections and surgeries.

163.   Steven John Touliopoulos, MD (hereinafter referred to as "Touliopoulos") is a physician licensed to practice medicine in the State of New York, and a principal of University.

164.   Touliopoulos knowingly profited from alleged medical and diagnostic services rendered as part of the University enterprise, including determining the services to be allegedly performed and orchestrating the submission of fraudulent claims for healthcare services.

165.   Touliopoulos materially contributed to the fraudulent treatment protocol by allegedly evaluating claimants, and/or billing for alleged evaluations purportedly performed by defendants Charles DeMarco, MD and/or Andrew Cruz, RPA, and by performing surgeries that were medically unnecessary and/or not causally related to the alleged workplace incidents.

166.   Charles DeMarco, MD (hereinafter referred to as "DeMarco") is a physician licensed to practice medicine in the State of New York.

167.   DeMarco knowingly profited from alleged medical and diagnostic services rendered as part of the University enterprise, including determining the services to be allegedly performed and orchestrating the submission of fraudulent claims for healthcare services.

168.   DeMarco materially profited from and furthered the fraudulent scheme by purporting to evaluate claimants upon referral from his colleague and coconspirator Touliopoulos, and/or thereafter performing surgeries and other procedures that were medically unnecessary and/or not causally related to the alleged workplace incidents.

169.   Lee Nigen, MD (hereinafter referred to as "Nigen") is a physician licensed to practice medicine in the State of New York.

170.   Nigen knowingly profited from alleged medical and diagnostic services rendered as part of the University enterprise, including determining the services to be allegedly performed and orchestrating the submission of fraudulent claims for healthcare services.

171.   Nigen materially profited from and furthered the fraudulent scheme by purporting to evaluate claimants upon referral from his colleagues and coconspirators Touliopoulos and DeMarco, and/or thereafter performing injections and other procedures that were medically unnecessary and/or not causally related to the alleged workplace incidents.

172.   Andrew M. Cruz, RPA (hereinafter referred to as "Cruz") is a physician's assistant so licensed to practice in the State of New York.

173.   Cruz knowingly assisted his colleagues Touliopoulos, DeMarco and Nigen by submitting fraudulent billing relating to alleged evaluations, and by assisting in surgeries and other procedures that were medically unnecessary and/or unrelated to the claimed workplace incidents.

174.   Individually and in concert, these individuals knowingly participated in fraudulent purported evaluations and treatment with the intent to subject claimants to medically unnecessary injections and surgeries in order to further the fraudulent enterprise.

175.     Individually and in concert, these individuals knowingly participated in fraudulent statements that the alleged injuries were causally related to alleged workplace incidents in order to further the fraudulent enterprise.

### c.  Andrew Merola, MD

176.     Andrew Merola, MD (hereinafter referred to as "Merola") is a physician licensed to practice medicine in the State of New York.

177.     Merola knowingly profited from alleged medical and diagnostic services rendered as part of the fraudulent enterprise, including determining the services to be allegedly performed and orchestrating the submission of fraudulent claims for healthcare services.

178.     Merola further knowingly profited by furthering the fraudulent treatment protocol by falsely submitting evaluations that opined claimants were disabled when they were not, and by performing unnecessary procedures.

179.     Individually and in concert with other defendants herein, Merola and his employees knowingly participated in fraudulent purported evaluations and treatment with the intent to subject claimants to medically unnecessary injections and surgeries in order to further the fraudulent enterprise.

180.     Individually and in concert with other defendants herein, Merola and his employees knowingly participated in fraudulent statements that the alleged injuries were causally related to alleged workplace incidents in order to further the fraudulent enterprise.

### c.  Joseph Weinstein DO, PC

181.    Joseph Weinstein DO PC, D/B/A Comprehensive Orthopedic & Spine Care (hereinafter referred to as "Weinstein PC") is a professional corporation registered in the State of New York. This entity has profited from fraudulent services allegedly performed by its personnel and has directly furthered the implementation of the fraudulent treatment protocol by allegedly evaluating claimants and thereafter performing unnecessary procedures including injections and surgeries.

182.   Joseph Weinstein, MD (hereinafter referred to as "Weinstein") is a physician licensed to practice medicine in the State of New York, and a principal of Weinstein PC.

183.    Weinstein PC operates a facility in Valley Stream, and upon information and belief Weinstein maintains a primary residence in Woodmere, both of which are in Nassau County, New York.

184.   Weinstein knowingly profited from alleged medical and diagnostic services rendered as part of the Weinstein PC enterprise, including determining the services to be allegedly performed and orchestrating the submission of fraudulent claims for healthcare services.

185.   Weinstein further knowingly profited by furthering the fraudulent treatment protocol by falsely submitting evaluations that opined claimants were disabled when they were not, and by performing unnecessary procedures.

186.   Individually and in concert, Weinstein and his employees knowingly participated in fraudulent purported evaluations and treatment with the intent to subject claimants to medically unnecessary injections and surgeries in order to further the fraudulent enterprise.

187.     Individually and in concert, Weinstein and his employees knowingly participated in fraudulent statements that the alleged injuries were causally related to alleged workplace incidents in order to further the fraudulent enterprise.

### 3. Diagnostic Facilities

#### a. Kolb Radiology, PC

188.     Kolb Radiology, PC (hereinafter referred to as "Kolb PC") is a professional corporation registered in the State of New York. This entity has profited by providing alleged magnetic resonance imaging (MRI) reports and has directly furthered the implementation of the fraudulent treatment protocol by identifying purported positive findings without correlation to degenerative conditions or otherwise providing an accurate representation of the claimants' conditions.

189.     Thomas Kolb, MD (hereinafter referred to as "Kolb") is a physician licensed to practice medicine in the State of New York, and a principal of Kolb PC.

190.     Kolb knowingly profited from alleged diagnostic services rendered as part of the Kolb PC enterprise, including identifying purported positive findings on MRI reports and orchestrating the submission of fraudulent claims for healthcare services.

191.     Individually and in concert, Kolb and his employees knowingly participated in fraudulent purported evaluations and treatment with the intent to subject claimants to medically unnecessary injections and surgeries in order to further the fraudulent enterprise.

192.    Individually and in concert, Kolb and his employees knowingly participated in fraudulent statements that the alleged injuries were causally related to alleged workplace incidents in order to further the fraudulent enterprise.

### b. Lenox Hill Radiology and Medical Imaging Associates, PC

193.    Lenox Hill Radiology and Medical Imaging Associates PC (hereinafter referred to as "Lenox Hill") is a professional corporation registered in the State of New York. This entity has profited by providing alleged magnetic resonance imaging (MRI) reports and has directly furthered the implementation of the fraudulent treatment protocol by identifying purported positive findings without correlation to degenerative conditions or otherwise providing an accurate representation of the claimants' conditions.

194.    Lenox Hill knowingly profited from alleged diagnostic services rendered as part of the fraudulent enterprise, including identifying purported positive findings on MRI reports and orchestrating the submission of fraudulent claims for healthcare services.

195.    Individually and in concert, Lenox Hill and its employees knowingly participated in fraudulent purported evaluations and treatment with the intent to subject claimants to medically unnecessary injections and surgeries in order to further the fraudulent enterprise.

196.    Individually and in concert, Lenox Hill and its employees knowingly participated in fraudulent statements that the alleged injuries were causally related to alleged workplace incidents in order to further the fraudulent enterprise.

### 4. Attorney Defendants

#### a. Workers' Compensation Firm

##### 1) Fogelgaren Forman & Bergman, LLP

197.   Fogelgaren Forman & Bergman, LLP (hereinafter referred to as "Fogelgaren LLP") is a legal limited liability partnership law firm registered in New York State that provides representation to alleged claimants before the New York State Workers' Compensation Board.

198.   Fogelgaren LLP's office is located at 100 William Street, Suite 1902, New York, New York 10038.

199.   Fogelgaren LLP performs an essential function to the fraudulent enterprise by identifying and shepherding claimants to providers in conjunction with tort attorney firm defendants and others.

200.   Eric Fogelgaren (hereinafter referred to as "Fogelgaren") is an attorney licensed to practice law in the State of New York and is a named principal of Fogelgaren LLP.

201.   Jonathan Elliot Forman (hereinafter referred to as "Forman") is an attorney licensed to practice law in the State of New York and is a named principal of Fogelgaren LLP.

202.   Robert Ira Bergman (hereinafter referred to as "Bergman") is an attorney licensed to practice law in the State of New York and is a named principal of Fogelgaren LLP.

203.    Fogelgaren LLP knowingly profited from the fraudulent enterprise, including orchestrating the submission of fraudulent claims for healthcare services and representing the claims as legitimate before the Board.

204.    Individually and in concert, Fogelgaren LLP, its principals and their employees knowingly represented fraudulent claimants in order to further the fraudulent enterprise.

### b.  Claimant Grooming & Personal Injury Enterprise Defendants

#### 1)  Personal Injury Firm Defendant Gorayeb & Associates

205.    Gorayeb & Associates, PC (hereinafter referred to as "Gorayeb PC") is a legal professional corporation law firm registered in New York State that provides representation to alleged claimants in their labor law actions.

206.    Gorayeb PC's principal office is located at 100 William Street, Suite 1900, New York, New York 10038, with additional offices located in all five boroughs of New York City and on Long Island.

207.    Gorayeb PC performs an essential function to the fraudulent enterprise by identifying and shepherding claimants to providers in conjunction with Workers' Compensation attorney firm defendants and others.

208.    Christopher J. Gorayeb (hereinafter referred to as "Gorayeb") is an attorney licensed to practice law in the State of New York, and the sole shareholder and principal of Gorayeb PC.

209.    Francisco Payano (hereinafter referred to as "Payano") is a former New York Police Department detective who was dismissed from the Department in 2015 on the grounds that "[l]ying about the sale of drugs, causing the imprisonment of individuals that did not commit the crimes

charged, and falsifying Department paperwork is an extraordinary ethical and professional failure." *In the Matter of the Charges and Specifications against Police Officer Francisco Payano*, Case No. 2011-5039, November 16, 2015, incorporated herein by reference.

210.    Defendant Payano has at all relevant times herein been employed as an "investigator" on behalf of Gorayeb PC, acting in apparent violation of N.Y. Judiciary Law § 482 and 22 N.Y.C.R.R. §§ 1200 Rule 7.3(a)(1) and (b), thereby further circumventing the provisions of 22 N.Y.C.R.R. § 1200 Rule 7.3(e) by soliciting individuals attending OSHA certification courses. Such activity was knowingly and expressly designed to ensure that Gorayeb PC and other defendants named herein could direct the course of claim from close to inception for the benefit of the enterprise.

211.  Acting on behalf of his employer Gorayeb PC, Defendant Payano offered specific incentives to workers in order to obtain access to job sites and legal advice regarding construction-related accidents without being licensed to do so in any legal or OSHA-related capacity.

212.    Neither Gorayeb PC nor Payano are licensed private investigators as required by New York State, specifically sections 70 and 71 of New York's General Business Law ("N.Y. G.B.L."), which prohibit entities and persons from engage in or advertise investigative services (N.Y. G.B.L. § 70.2), where such services specifically include investigations into accidents and injuries (N.Y. G.B.L. § 71.1).

213.  Plaintiffs note that Gorayeb PC's other alleged investigator, non-party Juan Tejeda, appears to have a security guard license (N.Y.S. License Number 10015882833), but not a private investigator license.

214. Gorayeb PC and its principal knowingly profited from the fraudulent enterprise, including orchestrating the implementation of fraudulent claims and the fraudulent treatment protocol at all relevant times, including its conspiracy with respect to all Sisa Pakari-related elements of the action and active participation thereto.

215. Individually and in concert, Gorayeb PC, its principal Gorayeb, Payano, and their employees knowingly represented fraudulent claimants and were instrumental in furthering said fraudulent claims in order to further the fraudulent enterprise and maximize recovery in tort actions.

### a. Sisa Pakari

216. Sisa Pakari Cultural Center Inc. and Sisa Pakari Centro Cultural & Laboral Inc. (hereinafter referred collectively to as "Sisa Pakari") are not-for-profit corporations domestically incorporated in New York State in 2001 and 2018, respectively. Both are owned and operated by defendant Fanny Guadalupe, ostensibly pursuant to their primary tax-exempt purpose.

217. Fanny Guadalupe, also known as Fanny Guadalupe Morocho (hereinafter referred to as "Guadalupe") is a resident of the State of New York, County of Queens, and is the putative president and principal of Sisa Pakari.

218. Defendant Guadalupe is not known to be licensed to conduct OSHA training yet has repeatedly participated in OSHA courses conducted under the auspices of Sisa Pakari, and knowingly and repeatedly provided a platform for Gorayeb PC to cultivate potential claimants under the guise of OSHA-related training.

219.  Rolando Marzano Moreno (hereinafter referred to as "Moreno" or "Don Rolando") is a resident of the State of New York, County of Queens and longtime employee of Sisa Pakari.

220.  Defendant Moreno has played an active role in Sisa Pakari's grooming of potential clients, including but not limited to setting up identification and bank accounts to which fraudulent claim payments are to be made and brokering meetings with attorneys under cover of religious services.

221.  Defendant Moreno is not known to be licensed to conduct OSHA training yet has repeatedly participated in OSHA courses conducted under the auspices of Sisa Pakari, and knowingly and repeatedly provided a platform for Gorayeb PC to cultivate potential claimants under the guise of OSHA-related training.

222.  Cidel del Carmen Tandoza Moreno (hereinafter referred to as "Tandoza") is an employee of Sisa Pakari and resident of New Jersey.

223.  Defendant Tandoza is an OSHA-authorized outreach trainer, authorized to conduct OSHA 10- and 30-hour courses in English. Defendant Tandoza has permitted her authorization to be utilized in furtherance of the Sisa Pakari scheme.

224.  In the deposition taken of Defendant Tandoza within the past year, she claimed to be unfamiliar with any aspect of New York's Industrial Code but professed to instruct with respect to OSHA regulations. However, she was unable to readily identify common OSHA regulations with which an OSHA certificate holder should be familiar, much less an authorized OSHA trainer.

225.  For at least 10 years, defendant Gorayeb has made payments to Sisa Pakari, which has in turn provided advertising and client solicitation on his behalf. These payments are publicly

portrayed as donations to further Hispanic culture, *see, e.g.,* "Gorayeb & Asociados apoya a Sisa Pakari a expandir la cultura hispana." *El Diario NY*, June 23, 2014 (the article remains available online at https://eldiariony.com/2014/06/23/gorayeb-asociados-apoya-a-sisa-pakari-a-expandirla-cultura-hispana/, incorporated herein by reference, last accessed February 5, 2024), or as "sponsorship," *see* Exhibit I, attached hereto and incorporated by reference.

226.   Gorayeb and/or Gorayeb PC have reportedly supported Sisa Pakari's OSHA courses financially and are acknowledged as sponsors thereof.

227.   Gorayeb and Guadalupe, along with their respective organizations, have conspired to utilize their access to Spanish-speaking individuals who do not possess more than rudimentary knowledge of English under the guise of providing OSHA training to preemptively solicit individuals who would become claimants in fraudulent enterprises.

228.   Defendant Tandoza allowed apparently uncertified individuals to act as instructors which in turn materially deviated from the safety training intended to be taught by OSHA courses, assuming that she herself was and is substantively competent to provide adequate training beyond her paper certification.

229.   As Manhattan's District Attorney explained while charging six non-parties with 261 acts sounding in enterprise corruption for issuing OSHA and related safety certificates and cards without adequately – or in some cases any – training, "this is unacceptable. In an industry like this, fraud has dire consequences. Indeed, fraud can mean life and death." Janoski, Steve "NYC safety school gave 20K construction workers certificates without training them — directly leading to man's death: DA Bragg," *New York Post*, February 28, 2024. Online version published at 4:50 PM, available at https://nypost.com/2024/02/28/us-news/sham-nyc-safety-school-gave-fake

certifications-to-more-than-20k-students-as-president-walked-away-with-millions-manhattan-da/, last accessed February 29, 2024.

## IV.

## ALLEGATIONS COMMON TO ALL COUNTS

230.    This Complaint is necessarily limited to four representative claims, each of which contains multiple predicate acts of mail and/or wire fraud by Defendants other than the Personal Injury Firm Defendant and its accomplices, who work together to preemptively create claims they can prospectively control and thereafter rely upon the submission of fraudulent treatment records and billing to the Workers' Compensation Board and to Tradesman in order to file personal injury actions designed to capitalize upon the false narratives to implicate purported Labor Law violations.

231.    As set forth hereinafter, each alleged claim constitutes its own fraudulent enterprise, in which various combinations of Defendants herein act in concert to create the illusion of a legitimate claim, while secondarily demonstrating an overarching enterprise scheme that encompasses the ancillary claims identified below as well as others not yet identifiable.

232.    In every such case, the claimant claimed to suffer some injury alleged to have taken place at the workplace. These alleged accidents are typically unrecorded and unwitnessed or appear to be minor incidents.

233.    All claimants eventually proceeded to a nearby emergency room or similar urgent care facility, at which they claimed serious injury that day yet were discharged with no evidence of fracture or other serious injury and could return to work within several days.

234.    Claimant A was allegedly injured on April 23, 2020, when he claims to have been struck by falling plywood that purportedly weighed 70 pounds, yet did not seek any treatment until five days later when he proceeded to non-party Urban Health Plan, in contradiction to records submitted that claim he went to an emergency room right after his alleged incident. *See* Exhibits J-1 and K-1, *infra*.

235.    Claimant B purportedly fell from a ladder on February 8, 2018, yet later records and filings variously claimed that he was instead "injured from falling off the third step of a ladder onto a steel beam, from falling from height, from tripping, from falling when one of the steps collapsed leaving him to fall six steps, falling off five-foot ladder, and falling from sixth step of a ladder." *See* Exhibit K-1 at p. 7, *see also* Exhibit J-2.

236.    Claimant B did not seek any medical treatment until he visited Elmhurst Hospital on March 1, 2018, proximate to the date on which he retained Defendant Fogelgaren PC, on or about March 6, 2018.

237.    Claimant C claimed to be injured on December 6, 2021 when he fell from an allegedly improperly secured elevated surface, yet "[o]ther records, medical in nature, say Patient C was injured while disposing of construction debris, when he fell from the second floor hitting his shoulder and leg on the left side, and/or while holding a heavy trash can weighing 50 lbs. when he slipped and fell on his left side." *See* Exhibit K-1 at p. 10, *see also* Exhibit J-3.

238.    Claimant D was allegedly injured on October 29, 2021, when he was purportedly hit by a metal beam that fell from a third floor of the construction site. However, "[o]ther records, medical in nature, say he was injured when the beam fell and hit his right arm, another when he twisted, another when twisted while withdrawing, fell backward, fell forward, fell backward

striking a pole and placing props. Such factual alleged actions are not consistent." *See* Exhibit K-1 at p. 11, *see also* Exhibit J-4.

239.    None of the emergency or urgent care facilities to which the Claimants first sought treatment found any significant injury.

240.    Rather than being the end of it, all Claimants were quickly steered to Workers' Compensation Defendant Firm and Medical Provider Defendants within days, typically NY Ortho or CitiMed, whose personnel quickly diagnosed a host of alleged injuries and claimed all were causally related to the alleged incident.

241.    These initial purported evaluations cannot be reconciled with emergency room hospital records when retained, and uniformly fail to even note emergency room findings inimical to the planned implementation of the fraudulent treatment protocol.

242.    Claimant B alleges to have hurt himself on February 8, 2018, when he allegedly fell off of a ladder,[2] but did not seek any medical treatment until he visited Elmhurst Hospital on March 1, 2018, almost a month after the incident and proximate to the date on which he retained Defendant Fogelgaren PC, March 6, 2018.

243.    Claimant C alleges to have fallen from six to 10 feet from a second story floor, yet did not suffer any fracture or contusion.

244.    Claimant D alleges that a metal bar fell from a story above him and struck his right arm, yet he too suffered no fracture.

245.    Regardless of the parts of the body reported to emergency hospital personnel as having been injured as alleged, the Claimants were all thereafter subjected to a multitude of

---

[2]      It is important to note of the four cases chosen, the facts surrounding the alleged accidents seem to vary remarkably.

diagnostic tests including radiographic imaging and nerve conduction studies to various body parts that invariably included the cervical, thoracic and lumbar regions of the spine.

246.    The imaging studies were used to claim that a series of disc herniations and bulges were somehow related to the initial unwitnessed alleged incident and caused by same despite being overall degenerative in nature. *See* Exhibits K-1 and K-2, attached hereto and incorporated herein by reference.

247.    Following the initial diagnosis from hospital personnel, the Claimants were purportedly started on some form of physical therapy to various body parts.

248.    The physical therapy medical records are overwhelmingly generic to the extent that they largely fail to document what body part was supposedly being treated, how they are being treated, diagnosis and prognosis. Physical Therapist Defendant Puia of Defendant NY Ortho PC does not substantiate what "therapeutic exercises" were allegedly performed to various body parts identified in the diagnosis section of the document as set forth below. In fact, many of the medical record entries appear to be replicated for each visit or admission.

249.    In addition to financial reimbursement, the clear purpose of the alleged physical therapy was to provide the semblance of conservative treatment.

250.    The physical therapy notes are in many instances cut and pasted without material change in alleged procedures, functional deficits, goals, assessments and plans, including identical misspellings of the word "functio" and "sofi-tissue," while reported pain is invariably described as "5-6".

251.    With respect to the three Claimants specifically identified herein as Claimant Enterprises (Claimants B, A, and C, respectively) allegedly treated by Defendant Puia on behalf

of Defendant NY Ortho, all allegedly obtained treatment for some form of purported lumbar pain and alleged knee pain.

252.    Despite being dated roughly two years apart from each other, and with two of the three claims alleging lumbar radiculopathy, the physical therapy notes are both largely identical and similarly vague to the extent that if the claimant's identifying information were to be removed, it would be difficult to determine which claimant was being allegedly treated:

**Procedure**

**THERAPEUTIC EXERCISES (97110)**

**Final, Reviewed**
Diagnosis: Low back pain (724.2 | M54.5)
Ordered by Adrian Puia, RPT on 11/15/2018 (Routine)
Performed on 11/15/2018 2:42 PM
Reviewed by Adrian Puia, RPT on 11/15/2018

**Physical Therapy Notes\*\*\***

Date: 11/15/2018
Procedure:
Therapy. exercise 97110
Neuromuscular Re-education 97112
Joint Mobilization 97140
Subjective: Patient continues to have pain in lower back and limited function
Objective: Tenderness/tightness PV thoracic-lumbar muscles, Diffuse spasm is present in lower back muscles, Lumbar motion is greatly restricted, Weakness pv thoracic-lumbar, Pain is described as 5-6
Functional deficits: Impaired mobility, motor function, muscle performance and rom
Goals: Decrease pain, Improve rom, improve strength, Improve motor function/performance
Assessment*: Patient will benefit from PT interventions to decrease pain and increase functio
Plan:
PT interventions to consist of modalities, therapeutic exercises, stretching/strengthening, soft-tissue manipulation including HEP

---

## Procedure

---

### THERAPEUTIC EXERCISES (97110)

████████████

**Final, Reviewed**

Diagnosis: Lumbar radicular pain (M54.16)
Ordered by Adrian Puia, RPT on 10/7/2020 (Routine)
Performed on 10/7/2020 2:03 PM
Reviewed by Adrian Puia, RPT on 10/7/2020

---

### Physical Therapy Notes***

<u>Date</u>: 10/7/2020
<u>Procedure</u>:
- Therapy. exercise 97110
- Neuromuscular Re-education 97112
- Joint Mobilization 97140

<u>Subjective</u>: PT currently complains of persistent low back and neck pain,Patient reports pain/stiffness left shoulder
<u>Objective</u>: Tenderness/tightness PV thoracic-lumbar muscles,Diffuse spasm is present in lower back muscles,Lumbar motion is greatly restricted,Tenderness PV cervical muscles,Cervical motion is greatly restricted,Crepitus with AROM,Tenderness anterior left shoulder,Decreased strength left shoulder,Pain is described as 5-6
<u>Functional deficits</u>: Impaired mobility, motor function, muscle performance and rom
<u>Goals</u>: Decrease pain,Improve rom,Improve strength,Improve motor function/performance
<u>Assessment*</u>: Patient will benefit from PT interventions to decrease pain and increase functio
<u>Plan</u>:
- PT interventions to consist of modalities, therapeutic exercises, stretching/strengthening, soft-tissue manipulation including HEP

---

## Procedure                                    ████████████

---

### THERAPEUTIC EXERCISES (97110)

████████████

**Final, Reviewed**

Diagnosis: Lumbar radiculopathy (M54.16)
Ordered by Adrian Puia, RPT on 9/6/2022 (Routine)
Performed on 9/6/2022 12:59 PM
Reviewed by Adrian Puia, RPT on 9/6/2022

---

### Physical Therapy Notes***

<u>Date</u>: 9/6/2022
<u>Procedure</u>:
- Therapy. exercise 97110
- Neuromuscular Re-education 97112
- Joint Mobilization 97140

<u>Subjective</u>: PT currently complains of persistent low back and neck pain,Patient reports pain/stiffness left shoulder,Patient reports pain/weakness left knee
<u>Objective</u>: Tenderness PV cervical-thoracic lumbar muscles,Diffuse spasm is present in lower back muscles,Lumbar motion is greatly restricted,Tenderness PV cervical muscles,Tenderness anterior left shoulder,Decreased strength left shoulder,Weakness with abduction, ER,Tenderness left knee anterior,Crepitus audible with AROM,Decreased strength quad
<u>Functional deficits</u>: Impaired mobility, motor function, muscle performance and rom
<u>Goals</u>: Improve rom,Improve gait,Improve gait pattern,Improve gai, locomotion and balance
<u>Assessment*</u>: Patient will benefit from PT interventions to decrease pain and increase functio
<u>Plan</u>:
- PT interventions to consist of modalities, therapeutic exercises, stretching/strengthening, soft-tissue manipulation including HEP

---

253.    The same pattern extends to claims in which individuals who demonstrated initial injuries only to be steered to these providers, and allegedly treated in identical fashion. Here too,

---

without identifying the claimants by name, it is clear that the alleged treatment notes were uniformly generated:

---

## Procedure

### THERAPEUTIC EXERCISES (97110)

**Final, Reviewed**
Diagnosis: Lumbar radicular pain (724.4 | M54.16)
Ordered by Adrian Puia, RPT on 12/3/2018 (Routine)
Performed on 12/3/2018 9:34 AM
Reviewed by Adrian Puia, RPT on 12/3/2018

### Physical Therapy Notes***

Date: 12/3/2018
Procedure:
Therapy. exercise 97110
Neuromuscular Re-education 97112
Joint Mobilization 97140
Subjective: Patient continues to have pain in lower back and limited function
Objective: Tenderness/tightness PV thoracic-lumbar muscles, Diffuse spasm is present in lower back muscles, Patient has difficulty mounting exercise table, Lumbar motion is greatly restricted, Weakness pv thoracic-lumbar
Functional deficits: Impaired mobility, motor function, muscle performance and rom
Goals: Decrease pain, improve rom, improve strength, improve motor function/performance
Assessment*: Patient will benefit from PT interventions to decrease pain and increase functio
Plan:
PT interventions to consist of modalities, therapeutic exercises, stretching/strengthing, soft-tissue manipulation including HEP

---

## Procedure

### THERAPEUTIC EXERCISES (97110)

**Final, Reviewed**
Diagnosis: Lumbago (M54.5)
Ordered by Adrian Puia, RPT on 3/4/2020 (Routine)
Performed on 3/4/2020 3:52 PM
Reviewed by Adrian Puia, RPT on 3/4/2020

### Physical Therapy Notes***

Date: 3/4/2020
Procedure:
 • Therapy. exercise 97110
 • Neuromuscular Re-education 97112
 • Joint Mobilization 97140
Subjective: Patient continues to have pain in lower back and limited function
Objective: Diffuse spasm is present in lower back muscles, Lumbar motion is greatly restricted, Pain is described as 5-6
Functional deficits: Impaired mobility, motor function, muscle performance and rom
Goals: Decrease pain, improve rom, improve strength
Plan:
 • PT interventions to consist of modalities, therapeutic exercises, stretching/strengthing, soft-tissue manipulation including HEP

---

**Patient:** ███████████████

Review Date: 3/9/2020 11:14 AM
Order Date: 3/9/2020 11:13 AM
Report Date: 3/9/2020 11:14 AM
Performed Date: 3/9/2020 11:13 AM
Procedure [Final, Reviewed]: THERAPEUTIC EXERCISES (97110) [ Physical Therapy Notes*** ]
Diagnosis: Lumbar radicular pain (M54.16)

**Patient DOB:** ██████████
Reviewed by: Puia, Adrian RPT
Ordered by: Puia, Adrian RPT

Date: 3/9/2020
Procedure:
Therapy. exercise 97110
Neuromuscular Re-education 97112
Joint Mobilization 97140
Subjective: Patient continues to have pain in lower back and limited function
Objective: Tenderness/tightness PV thoracic-lumbar muscles, Diffuse spasm is present in lower back muscles, Lumbar motion is greatly restricted, Weakness pv thoracic-lumbar, Pain is described as 5-6
Functional deficits: Impaired mobility, motor function, muscle performance and rom
Goals: Decrease pain, Improve rom, improve strength, Improve motor function/performance
Assessment*: Patient will benefit from PT interventions to decrease pain and increase functio
Plan:
PT interventions to consist of modalities, therapeutic exercises, stretching/strengthening, sofi-tissue manipulation including HEP

**Patient:** ████████████████

Review Date: 2/25/2021 10:27 AM
Order Date: 2/25/2021 10:26 AM
Report Date: 2/25/2021 10:27 AM
Performed Date: 2/25/2021 10:26 AM
Procedure [Final, Reviewed]: THERAPEUTIC EXERCISES (97110) [ Physical Therapy Notes*** ]
Diagnosis: Lumbar radicular pain (M54.16)

**Patient DOB:** ██████████
Reviewed by: Puia, Adrian RPT
Ordered by: Puia, Adrian RPT

Date: 2/25/2021
Procedure:
Therapy. exercise 97110
Neuromuscular Re-education 97112
Joint Mobilization 97140
Subjective: Patient continues to have pain in lower back and limited function
Objective: Tenderness/tightness PV thoracic-lumbar muscles, Diffuse spasm is present in lower back muscles, Lumbar motion is greatly restricted, Weakness pv thoracic-lumbar, Pain is described as 5-6
Functional deficits: Impaired mobility, motor function, muscle performance and rom
Goals: Decrease pain, Improve rom, improve strength, Improve motor function/performance
Assessment*: Patient will benefit from PT interventions to decrease pain and increase functio
Plan:
PT interventions to consist of modalities, therapeutic exercises, stretching/strengthening, sofi-tissue manipulation including HEP

**Patient:** ███████████████

Review Date: 8/26/2021 11:18 AM
Order Date: 8/26/2021 11:18 AM
Report Date: 8/26/2021 11:18 AM
Performed Date: 8/26/2021 11:18 AM
Procedure [Final, Reviewed]: THERAPEUTIC EXERCISES (97110) [ Physical Therapy Notes*** ]
Diagnosis: Pain in lower back (M54.50)

**Patient DOB:** ██████████
Reviewed by: Puia, Adrian RPT
Ordered by: Puia, Adrian RPT

Date: 8/26/2021
Procedure:
Therapy. exercise 97110
Neuromuscular Re-education 97112
Joint Mobilization 97140
Subjective: PT currently complains of persistent low back and neck pain
Objective: Tenderness PV cervical-thoracic lumbar muscles, Diffuse spasm is present in lower back muscles, Lumbar motion is greatly restricted, Weakness pv thoracic-lumbar, Pain is described as 5-6
Functional deficits: Impaired mobility, motor function, muscle performance and rom
Goals: Decrease pain, Improve rom, improve strength, Improve motor function/performance
Assessment*: Patient will benefit from PT interventions to decrease pain and increase functio
Plan:
PT interventions to consist of modalities, therapeutic exercises, stretching/strengthening, sofi-tissue manipulation including HEP

Patient:⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛          Patient DOB: ⬛⬛⬛⬛⬛⬛
Review Date: 5/4/2022 10:27 AM                   Reviewed by: Puia, Adrian RPT
Order Date: 5/4/2022 10:26 AM                    Ordered by: Puia, Adrian RPT
Report Date: 5/4/2022 10:27 AM
Performed Date: 5/4/2022 10:26 AM
Procedure [Final, Reviewed]: THERAPEUTIC EXERCISES (97110) [ Physical Therapy Notes*** ]
Diagnosis: Low back pain (M54.50)

Date: 5/4/2022
Procedure:
Therapy. exercise 97110
Neuromuscular Re-education 97112
Joint Mobilization 97140
Subjective: Patient states pain, stiffness in lower back
Objective: Tenderness lumbosacral pv muscles, Tenderness/tighness P.V. muscles left > right, Lumbar motion is greatly restricted, Pain is described as 5-6
Functional deficits: Impaired mobility, motor function, muscle performance and rom
Goals: Decrease pain, Improve rom, improve strength, Improve motor function/performance
Assessment*: Patient will benefit from PT interventions to decrease pain and increase functio
Plan:
PT interventions to consist of modalities, therapeutic exercises, stretching/strengthening, sofi-tissue manipulation including HEP

254.     The Claimants' knee treatment notes are similarly interchangeable to the extent that without prior knowledge that the first two notes below allegedly belong to Claimant B and the third to Claimant C, any or all of the following could have been ascribed to anyone.

255.     Within Claimant B's two notes below, the entirety of the alleged notes for his left and right knees, dated nine months apart, are identical aside from substituting right for left, including bullet points before the alleged procedures and plan, and slight reorganizing of the purported objective findings without altering any wording:

**Procedure**

**THERAPEUTIC EXERCISES (97110)**

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

**Final, Reviewed**
Diagnosis: Pain in left knee (719.46 | M25.562)
Ordered by Adrian Puia, RPT on 1/16/2019 (Routine)
Performed on 1/16/2019 2:02 PM
Reviewed by Adrian Puia, RPT on 1/16/2019

**Physical Therapy Notes***

Date: 1/16/2019
Procedure:
Therapy. exercise 97110
Neuromuscular Re-education 97112
Joint Mobilization 97140
Subjective: Patient reports pain/weakness left knee
Objective: Tenderness left knee anterior, Crepitus audible with AROM, Decreased strength quad, Eccentric quad control 4/5
Functional deficits: Impaired mobility, motor function, muscle performance and rom
Goals: Decrease pain, Improve strength, Improve rom, Improve motor function/performance, Improve gait pattern
Assessment*: Patient will benefit from PT interventions to decrease pain and increase functio
Plan:
PT interventions to consist of modalities, therapeutic exercises, stretching/strengthening, sofi-tissue manipulation including HEP

Procedure

**THERAPEUTIC EXERCISES (97110)**

**Final, Reviewed**
Diagnosis: Pain in right knee (719.46 | M25.561)
Ordered by Adrian Pula, RPT on 8/25/2020 (Routine)
Performed on 8/25/2020 1:47 PM
Reviewed by Adrian Pula, RPT on 8/25/2020

**Physical Therapy Notes\*\*\***
Date: 8/25/2020
Procedure:
• Therapy. exercise 97110
• Neuromuscular Re-education 97112
• Joint Mobilization 97140
Subjective: Patient reports pain/weakness right knee
Objective: Tenderness right knee anterior,Decreased strength quad,Crepitus audible with AROM,Eccentric quad control 4/5
Functional deficits: Impaired mobility, motor function, muscle performance and rom
Goals: Decrease pain,Improve rom,Improve strength,Improve motor function/performance
Assessment: Patient will benefit from PT interventions to decrease pain and increase functio
Plan:
• PT interventions to consist of modalities, therapeutic exercises, stretching/strengthening, soft-tissue manipulation including HEP

Procedure

**THERAPEUTIC EXERCISES (97110)**

**Final, Reviewed**
Diagnosis: Pain in left knee (M25.562)
Ordered by Adrian Pula, RPT on 2/7/2022 (Routine)
Performed on 2/7/2022 10:18 AM
Reviewed by Adrian Pula, RPT on 2/7/2022

**Physical Therapy Notes\*\*\***
Date: 2/7/2022
Procedure:
• Therapy. exercise 97110
• Neuromuscular Re-education 97112
• Joint Mobilization 97140
Subjective: Patient reports pain/weakness left knee
Objective: Tenderness medial joint line knee,Crepitus audible with AROM,Decreased strength quad,Eccentric quad control 4/5,Gait abnormal
Functional deficits: Impaired mobility, motor function, muscle performance and rom
Goals: Decrease pain,Improve rom,Improve strength,Improve motor function/performance
Assessment: Patient will benefit from PT interventions to decrease pain and increase functio
Plan:
• PT interventions to consist of modalities, therapeutic exercises, stretching/strengthening, soft-tissue manipulation including HEP

256.    The alleged knee treatment notes are even more generic in that the subjective section is uniform across the Claimants, with the allegedly objective findings nearly so. The overwhelming bulk of the notes are identical to each other and to notes purportedly relating to treatment to other body parts across claims.

257.    With respect to alleged pre-surgical treatment to claimants' shoulders, the progress notes are also similarly uniform so as to appear designed to facially comply with section D.7.e.ii

(titled "Non-Operative Treatment Procedures) of the current *New York State Medical Treatment Guidelines: Shoulder Injury:*

> "If no clinically significant increase in function for a partial- or full-thickness tear is observed after adequate participation in a rehabilitation program, a surgical consultation is indicated. Adequate is here defined as at least 75% attendance in an active physical therapy program with a minimum of two to three sessions per week for four weeks. A physical therapy program that is based solely on passive modalities, or for which the claimant has not demonstrated compliance, is insufficient".

*See* https://www.wcb.ny.gov/content/main/hcpp/MedicalTreatmentGuidelines/Shoulder Injury MTG2021.pdf, incorporated herein by reference, last accessed February 22, 2024.

258.    The preceding is materially identical to the guidelines in force from 2014 until implementation of the current Guideline in 2022. *See*, New York State Medical Treatment Guidelines, Third Edition September 15, 2014 at p. 38, at https://www.wcb.ny.gov/content/main/hcpp/MedicalTreatmentGuidelines/ShoulderInjuryMTG2014.pdf, incorporated herein by reference, last accessed February 22, 2024.

259.    With respect to alleged shoulder treatment, with the notable exception of Claimant C, whose physical therapy plan for left shoulder treatment is unique, all available physical therapy progress notes for alleged shoulder treatment are uniform in listing the alleged procedures, functional deficits, goals, assessments and plans, including identical misspellings of the word "functio" and "sofi-tissue," while reported pain is nearly always described as "5-6", with rare exceptions in which it is reported at a higher rate.

---

### Procedure

---

## THERAPEUTIC EXERCISES (97110)

██████████████

---

**Final, Reviewed**
Diagnosis: Pain in left shoulder (719.41 | M25.512)
Ordered by Adrian Puia, RPT on 12/2/2020 (Routine)
Performed on 12/2/2020 2:29 PM
Reviewed by Adrian Puia, RPT on 12/2/2020

---

### Physical Therapy Notes***

Date: 12/2/2020
Procedure:
- Therapy. exercise 97110
- Neuromuscular Re-education 97112
- Joint Mobilization 97140

Subjective: Patient reports pain/stiffness left shoulder,PT currently complains of persistent low back and neck pain
Objective: Tenderness anterior/posterior left shoulder (sub-acromial region),Decreased strength left shoulder (4/5),Decreased scapula, humeral rhythm,Weakness with abduction, ER,Painful arc 60 degrees - 120 degrees of elevation,Decreased AROM (Abd 130),Pain is described as 5-6,Tenderness PV cervical-thoracic lumbar muscles,Diffuse spasm is present in lower back muscles,Tenderness PV cervical muscles
Functional deficits: Impaired mobility, motor function, muscle performance and rom
Goals: Decrease pain,Improve rom,improve strength,Improve motor function/performance
Assessment*: Patient will benefit from PT interventions to decrease pain and increase functio
Plan:
- PT interventions to consist of modalities, therapeutic exercises, stretching/strengthening, soft-tissue manipulation including HEP

---

### Procedure

---

## THERAPEUTIC EXERCISES (97110)

████████████

---

**Final, Reviewed**
Diagnosis: Pain in left shoulder (M25.512)
Ordered by Adrian Puia, RPT on 5/10/2022 (Routine)
Performed on 5/10/2022 1:55 PM
Reviewed by Adrian Puia, RPT on 5/10/2022

---

### Physical Therapy Notes***

Date: 5/10/2022
Procedure:
- Therapy. exercise 97110
- Neuromuscular Re-education 97112
- Joint Mobilization 97140

Subjective: Patient reports pain/stiffness left shoulder
Objective: Tenderness anterior left shoulder,Decreased strength left shoulder,Weakness with abduction, ER,Pain is described as 5-6
Functional deficits: Impaired mobility, motor function, muscle performance and rom
Goals: Decrease pain,Improve rom,Improve strength,Improve motor function/performance
Assessment*: Patient will benefit from PT interventions to decrease pain and increase functio
Plan:
- Proprioception exercises, scapular stabilization, neuromuscular control shoulder girdle, closed chain stabilization, cryotherapy.

---

███████████████████████ **Procedure** ████████████████████████

## THERAPEUTIC EXERCISES (97110)

████████████████

**Final, Reviewed**
Diagnosis: Pain in right shoulder (719.41 | M25.511)
Ordered by Adrian Puia, RPT on 8/30/2018 (Routine)
Performed on 8/30/2018 9:16 AM
Reviewed by Adrian Puia, RPT on 8/30/2018

### Physical Therapy Notes***

Date: 8/30/2018
Procedure:
Therapy. exercise 97110
Neuromuscular Re-education 97112
Joint Mobilization 97140
Subjective: Patient reports pain/stiffness right shoulder
Objective: Tenderness anterior right shoulder, Decreased strength right shoulder, Pain is described as 5-6
Functional deficits: Impaired mobility, motor function, muscle performance and rom
Goals: Decrease pain, Improve rom, improve strength, Improve motor function/performance
Assessment*: Patient will benefit from PT interventions to decrease pain and increase functio
Plan:
PT interventions to consist of modalities, therapeutic exercises, stretching/strengthening, soft-tissue manipulation including HEP

**Patient:** ████████████████          **Patient DOB:** ████████████
Review Date: 5/15/2019 11:04 AM                Reviewed by: Puia, Adrian RPT
Order Date: 5/15/2019 11:02 AM                 Ordered by: Puia, Adrian RPT
Report Date: 5/15/2019 11:04 AM
Performed Date: 5/15/2019 11:03 AM
Procedure [Final, Reviewed]: THERAPEUTIC EXERCISES (97110) [ Physical Therapy Notes*** ]
Diagnosis: Left shoulder pain (M25.512)

Date: 5/15/2019
Procedure:
Therapy. exercise 97110
Neuromuscular Re-education 97112
Joint Mobilization 97140
Subjective: Patient reports pain/stiffness left shoulder
Objective: Tenderness anterior/posterior left shoulder, Decreased strength left shoulder, Weakness with abduction, ER, Pain is described
as 5-6
Functional deficits: Impaired mobility, motor function, muscle performance and rom
Goals: Decrease pain, Improve rom, improve strength, Improve motor function/performance
Assessment*: Patient will benefit from PT interventions to decrease pain and increase functio
Plan:
PT interventions to consist of modalities, therapeutic exercises, stretching/strengthening, soft-tissue manipulation including HEP

**Patient:** ████████████████          **Patient DOB:** ████████████
Review Date: 4/21/2021 10:02 AM                Reviewed by: Puia, Adrian RPT
Order Date: 4/21/2021 10:01 AM                 Ordered by: Puia, Adrian RPT
Report Date: 4/21/2021 10:02 AM
Performed Date: 4/21/2021 10:01 AM
Procedure [Final, Reviewed]: THERAPEUTIC EXERCISES (97110) [ Physical Therapy Notes*** ]
Diagnosis: Left shoulder pain (M25.512)

Date: 4/21/2021
Procedure:
Therapy. exercise 97110
Neuromuscular Re-education 97112
Joint Mobilization 97140
Subjective: Patient reports pain/stiffness left shoulder
Objective: Tenderness anterior left shoulder, Decreased strength left shoulder, Weakness with abduction, ER, Painful arc 60 degrees -
120 degrees of elevation, Pain is described as 5-6
Functional deficits: Impaired mobility, motor function, muscle performance and rom
Goals: Decrease pain, improve strength, Improve tolerance of position activities, Improve motor function/performance
Assessment*: Patient will benefit from PT interventions to decrease pain and increase functio
Plan:
PT interventions to consist of modalities, therapeutic exercises, stretching/strengthening, soft-tissue manipulation including HEP

260.    With respect to Claimant D, the alleged physical therapy component alleged to have occurred prior to injections and surgeries was not provided for Plaintiffs' review, yet the fraudulent treatment protocol was implemented in all other relevant ways by the providers involved in that enterprise.

261.    Medical Doctor Defendants thereafter claimed to evaluate the claimants, and invariably found that conservative treatment had 'failed' before prescribing a series of unnecessary injections and even surgeries.

262.    To provide a representative example separate and distinct from the Claimant C Enterprise set forth below, Defendant Kaplan allegedly re-evaluated Claimant C and claimed to assess "Internal derangement left knee with symptomatic meniscal tear, unresponsive to conservative treatment Partial tear of rotator cuff left shoulder". This supposed failure of barely alleged conservative care led to Defendant Kaplan's request for authorization for left knee arthroscopy and 'additional' therapy to the left shoulder and left knee. *See* Exhibit J-3.5, attached hereto and incorporated herein by reference (the alleged re-evaluation was allegedly documented "06/03/2022 12:00 AM"). *Id*.

263.    Despite its self-justifying nature, it is notable that Defendant Kaplan's assessment of a symptomatic meniscal tear is nowhere referenced in Defendant Puia's alleged treatment notes, much less addressed in the context of specific treatment that would customarily be provided.

264.    Defendant Kaplan's representative alleged re-evaluation is similarly notable in that it makes oblique reference that Claimant C "appears to have a popliteal effusion posteriorly." However, the MRI report submitted by Defendant Kolb claimed to show a partial tear of the anterior cruciate ligament and an otherwise unidentified "small joint effusion". *See* Exhibit J-3.2 attached hereto and incorporated herein by reference (January 3, 2022 left knee MRI report).

265.    All claimants were directed to undergo epidural steroid injections at Ambulatory Surgery Center Defendants' various locations.

266.    After NY Ortho's physical therapist, Defendant Puia, allegedly provided physical therapy, its own Dr. Grimm performed the alleged injections at one of the specified ambulatory surgery centers, most often Defendant Fifth Avenue Surgery Center.

267.    In the case of Claimants A and B, both underwent surgery to at least two extremities thereafter, without ever discernibly having received any actual physical therapy prior.

268.    Plaintiffs will not speculate at this time as to post-surgical physical or other therapy that may have been provided in the course of any claimant enterprise.

269.    The surgeries overwhelmingly took place at ambulatory surgery centers named as Defendants herein, though the pattern demonstrates that after the claim enterprise had been well-established with prior injections and surgeries having taken place, some later surgeries were performed at local hospitals.

270.    Defendants take further advantage of the fact that they are under no obligation to submit hospital records – the only records typically outside of the control of Defendants' enterprises – to the Workers' Compensation Board. Rather, it is the responsibility of the employer or insurance carrier alone to submit same upon receipt. 12 N.Y.C.R.R. § 300.3.

271.    As noted above, each claim constitutes its own enterprise, wherein varying combinations of Defendants act in concert to create the semblance of a legitimate claimant who undergoes significant sustained alleged treatment submitted to the New York State Workers' Compensation Board and resultingly paid by or on behalf of Tradesman to benefit directly from said payments and to establish alleged damages subsequently sought in the tort action, ultimately recoverable against Roosevelt.

272.     While the enterprises revolve around the submission of fraudulent treatment records and bills to Tradesman and to the New York State Workers' Compensation Board, however, the groundwork for each lucrative individual enterprises is laid long before there ever is any alleged claim.

### A.     GROOMING CLAIMANTS: SISA PAKARI, GORAYEB & OSHA CLASSES

273.     As stated above, Defendants Gorayeb and Gorayeb PC have a longstanding relationship with Defendants Guadalupe and Sisa Pakari that has included financial components.

274.     Publicly couched in terms of expanding Hispanic culture, Defendant Gorayeb PC has become enmeshed with Sisa Pakari to the extent that it – a law firm – has been prominently displayed on Sisa Pakari's communications.

275.     This has apparently long included sponsorship of 10 hours of Spanish-language OSHA training allegedly provided every 15 days. *See* "Gorayeb & Asociados apoya a Sisa Pakari a expandir la cultura hispana," *El Diario NY*, June 23, 2014, at https://eldiariony.com/2014/06/23/gorayeb-asociados-apoya-a-sisa-pakari-a-expandir-la-cultura-hispana/, last accessed February 5, 2024, and incorporated herein by reference.

276.     While New York State's Rules of Professional Conduct are not directly relevant to the causes of action herein, Rule 7.3(a)(1) thereof specifically prohibits an attorney from soliciting "by in-person or telephone contact, or by real-time or interactive computer-accessed communication unless the recipient is a close friend, relative, former client or existing client".

277.     In turn, Rule 7.3(b) defines solicitation as "any advertisement initiated by or on behalf of a lawyer or law firm that is directed to, or targeted at, a specific recipient or group of

recipients, or their family members or legal representatives, the primary purpose of which is the retention of the lawyer or law firm, and a significant motive for which is pecuniary gain."

278.    On December 2, 2022, Sisa Pakari posted a short video to TikTok and to YouTube, with the description reading "CLASE DE OSHA SST-OSHA 40 HORAS EN SISA PAKARI :929.361.0673", at https://www.youtube.com/shorts/EPem7sXCU2A, last accessed February 5, 2024, and incorporated herein by reference.

279.    The video, which is an advertisement for 40 hours of OSHA courses, prominently displays a message of thanks to Gorayeb, "GRACIAS A GORAYEB" along with two images of the firm's logo and contact information, followed by a QR code that directs users to a GoogleUserContent.com site: https://lh4.googleusercontent.com/DQVRiFT51OLZoqJFz F2z__c1SKHts4OHuU70CHMrpixx9bzNJq89cpBRJ0e2JHGgWLDdVE9xsN3u0QHUlSwLQW akiy4itqUiaFLveTclSxUuks4iZ_HDMdP5D9hMjEWYl_2CIWt3-thhzzxY90gdQl1_U8JpGhER ONYBtE5EG48l9UwcayVH6E-UIORoLYt, last accessed February 5, 2024, and incorporated herein by reference.

280.    The GoogleUserContent.com page consists of an image advertising several OSHA-related programs and identifies Gorayeb as sponsor:



281.     Due to the open and ongoing relationship between Gorayeb PC and Sisa Pakari, whose website continues to identify his firm as specializing in construction accidents (https://www.sisapakari.org/, last accessed February 5, 2024, and incorporated herein by

reference), Tradesman retained Power Investigations, Inc. (hereinafter referred to as "Power") to participate in a Sisa Pakari OSHA course, which began on November 30, 2022 and concluded on December 17, 2022, as set forth in Exhibit C, attached hereto and incorporated herein by reference.

282.　An employee of Power personally attended these courses and recorded portions thereof. True and accurate transcripts of the original Spanish and translations of same are attached hereto as hereto as Exhibit D-1, December 4, 2022, Recorded OSHA Course Transcript (Francisco Payano), Exhibit D-2, December 10, 2022, Recorded OSHA Course Transcript (rec00003(1), Exhibit D-3, December 4, 2022, Recorded OSHA Course Transcript (rec00006), Exhibit D-4, December 17, 2022, Recorded OSHA Course Transcript (rec00004), Exhibit D-5, Recorded OSHA Course Transcript (rec 00006(1)), and Exhibit D-6, December 11, 2022, Recorded OSHA Course Transcript (rec00008), and incorporated herein by reference.

283.　As set forth by the Affidavit of William Brian McCauley of Power annexed hereto as Exhibit C and incorporated by reference, the identity of its employee who attended and recorded portions of the Defendant Sisa Pakari's course has been kept confidential for his or her safety, including but not limited to the open and notorious presence of two MS-13 gang members at the course and the possibility of retaliation from other parties.

284.　The ostensible course instructor is Defendant Tandoza, Defendant Sisa Pakari's employee since 2017, *see* Exhibit D-2, attached hereto and incorporated by reference, who instructed attendees on how "Rolando" a/k/a Defendant Moreno would assist attendees in how to obtain the services of an accountant, send bills, open bank accounts and thereby obtain IDs. *See* Exhibit D-3 attached hereto and incorporated by reference.

285.　Both the December 4, 2022, and December 17, 2022 classes included presentations by Defendant Payano, who provided his business card to attendees. *See* Exhibit L, attached hereto

and incorporated by reference (the card clearly identifies him as an employee of Gorayeb PC, specifically as an "Investigator").

286.    During his presentation, Defendant Payano advised attendees not to purchase false identification or use false names, but directed them to utilize ITINs and to refuse to provide social security numbers to their employers. *See* Exhibit D-1 attached hereto and incorporated by reference.

287.    Notwithstanding his statement, identification was required for entrance into the OSHA course, and it was obtained by fraudulent means upon the recommendation of Defendant Sisa Pakari personnel as a prerequisite. *See* Exhibit C, attached hereto and incorporated by reference.

288.    Defendant Payano consistently urged attendees to call for an ambulance in the event of an incident, because "if you go in an ambulance the boss cannot deny that the accident happened on the job …. From the moment that ambulance report arrives at compensation, right away that will get approved in a couple of months." *See* Exhibit D-1 at p. 3 and Exhibit D-4 at p. 2, expressly stating "[b]ut if you are in an accident, you call an ambulance", all of which are attached hereto and incorporated by reference.

289.    Later in his December 4, 2022, presentation, Defendant Payano's purpose is revealed, in that he spent considerable time explaining how "Construction workers are the only workers, 99% of the time, they are the only ones that can, let's say, have a lawsuit at the time of the accident" (*Id* at p. 7), "Because labor laws were violated when the accident happened." *See* Exhibit D-1 at p. 8, attached hereto and incorporated by reference. *See also* Exhibit D-4, at pp. 1-2, attached hereto and incorporated by reference.

290.     After differentiating between falling off of a height, slipping in a hallway and lifting something heavy (*Id.* at pp. 8-9), Defendant Payano instructed that "[f]or a lawsuit there must be fall, some material falling on the person's head or on another body part, that is a lawsuit." *See* Exhibit D-1 at p. 9, attached hereto and incorporated by reference.   *See also* Exhibit D-at p. 2, attached hereto and incorporated by reference.

291.     While couched in terms of a 'consultation', Defendant Payano solicited potential clients, by reminding them that "[m]y cell phone number is on the little cards I gave you, save it. Any legal questions you may have, we do not charge for a consultation, okay? At Gorayeb, consultations are free. You call me on my cell phone number with whatever you need, and I will find the necessary information that you need, okay?" *See* Exhibit D-1, at p. 9, attached hereto and incorporated by reference. *See* also Exhibit D-4 at p. 3, attached hereto and incorporated by reference.

292.     In addition to the Gorayeb PC-branded sweatshirts provided to graduates of Defendant Sisa Pakari's OSHA classes (*see* Exhibit D-4at p. 3, attached hereto and incorporated by reference.) Defendant Payano twice informed attendees that he would deliver additional sweatshirts to job sites, along with food to work sites. *See* Exhibit D-1 at p.11 and Exhibit D-4, at p. 4, all of which are attached hereto and incorporated by reference.

293.     On December 17, 2022, Defendant Payano elaborated that in order to collect additional free sweatshirts and food, workers must take a photograph at work, "From the back, when you're working on a ladder, a friend can take a picture, you send me the picture, and I bring you lunch for that, okay?" *See* Exhibit D-4 at p. 4, attached hereto and incorporated by reference.

294.     Using the offer of free sweatshirts and food, Defendant Gorayeb PC's unlicensed investigator sought to gain access to job sites and photographs of workers on ladders that could later be used in the furtherance of the enterprises detailed herein and the overarching scheme.

295.     Defendant Sisa Pakari's key involvement in the overall scheme extends well past providing a platform for Defendant Gorayeb PC to improperly provide legal advice and solicit clients.

296.     Defendant Guadalupe directed attendees to contact her in the event of an alleged accident, "you call me, and you will find all the information here, and I will send the help so you can…" *See* Exhibit D-5 at p. 2, attached hereto and incorporated by reference.

297.     Defendant Guadalupe proceeded to advise attendees to apparently misrepresent their claims, and to refrain from working in order to continue receiving benefits, and necessarily therefore not because they were in fact incapable of working. *Id.* at pp. 2-3.

298.     Defendant Guadalupe further played a key role in pre-selecting claimants, including her December 11, 2022 speech in which she directed certain individuals to proceed to a nearby church:

> "Oh, oh, before you leave, those that have the bracelet, the ones that have the cell phone and need help from the, the lawyer, you have to come. You will finish with class on Saturday, you can go on Sunday because he only provides services on Sundays. We have an agreement with San Pedro church, and you come, and you get the letter from Don Rolando, and with that, you go on Sunday, any Sunday, and you show up at 1:00 in the afternoon. The priest finishes giving mass, and you say to him, 'father, my colleague Fanny Guadalupe sent me, and I need a consultation with the lawyer.' And the lawyers are there, doing consultations, only until three. From 1:00 to 3:00 in the afternoon, free, okay? So, get out your cell phones, and search for Sisa Pakari. With that, we will finish …"

299.     *See* Exhibit D-6 at p. 3, attached hereto and incorporated by reference.

300.     "Don Rolando" is known to be Defendant Moreno, and "San Pedro" is better known as Saint Peter's Church, located at 619 Lexington Avenue New York, NY 10022, which offers Spanish-language mass at 1:00 PM on Sundays. *See* www.saintpeters.org, last accessed February 23, 2024, and incorporated by reference.

301.     At the end of her presentation, Defendant Guadalupe again instructed the attendees that "Any accident, you call me or you call the lawyer, but you have to tell them you are member of, what?" *See* Exhibit D-6 at p. 4, attached hereto and incorporated by reference.

302.     Plaintiffs do not know the identity of the priest who assisted the enterprise, but upon information and belief, Defendant Guadalupe's references to "the lawyer" uniformly related to Defendant Gorayeb and/or his employees.

303.     Saint Peter's Church has further offered its own alleged OSHA classes, but Plaintiffs lack knowledge as to further connections between the course and Defendants herein.

304.     The advertisement below referenced a 40 hour combined OSHA course to be conducted between March 13 and March 22, 2023, and remains posted on the church's website at https://www.saintpeters.org/parish-life/2023/3/16/osha-authorized-training-courses-in-spanish, last accessed February 23, 2024, and incorporated by reference.

305.     The alleged location of the course is given as 86-18 Broadway, Elmhurst, NY 11373, owned by Golden Sparkling NY LLC, and home to a one-story retail building apparently completely occupied by "New Golden Sparkling Inc., which is a supermarket.



306.    Irrespective of any courses theoretically taught in a supermarket, Defendant

Gorayeb's improper involvement in OSHA classes extends beyond the Sisa Pakari facility, though

the full extent is not presently known.

307.    As a demonstrative but not exclusive example, Fast Track Safety Training Center a/k/a Fast Track Safety & Learning, Inc. is located at 322 Grove Street, Brooklyn, NY 11237, and routinely hosts OSHA training courses.

308.    Photographs published by or on behalf of Fast Track show large banners of Gorayeb PC, with the attendees wearing a Gorayeb PC sweatshirt, such as the two posted below on April 9, 2020. Available online at https://www.yelp.com/biz_photos/fasttrack-training-safety-center-brooklyn?select=DhCn1_g7Rg3AEs1dkFa5TA, (below left) and https://www.yelp.com/biz_photos/fasttrack-training-safety-center-brooklyn?select=eziBmi9XtMhdV_tB8SCGdA, (below right). last accessed February 23, 2024.



309.    Further photographs show graduates of the safety course wearing Gorayeb PC sweatshirts, including but not limited to the photograph below, which was posted by a user

identified as Massimilliano Mattezzi in October 2019. Available online at https://www.google.com/maps/contrib/107347614113675130675/photos/@40.698973,-73.91472,3a,99.8y,90t/data=!3m7!1e2!3m5!1sAF1QipNnfdxoAQD8GQscwLgWjAD7mILMY8 3FtzebuBZ1!2e10!6shttps:%2F%2Flh5.googleusercontent.com%2Fp%2FAF1QipNnfdxoAQD8 GQscwLgWjAD7mILMY83FtzebuBZ1%3Dw365-h273-k-no!7i640!8i480!4m3!8m2!3m1!1e1?entry=ttu, last accessed February 23, 2024.



310.    More recently, a user identified as Ramiro Gomez posted a photograph tagged as "FAST TRACK TRAINING & LEARNING" in October of 2022 in which three men can be seen wearing "Fast Track" hats and Gorayeb PC-branded safety shirts. Available online at

https://www.google.com/maps/contrib/108985633567762531354/photos/@40.698973,-73.91472,-12a,63.9y/data=!3m7!1e2!3m5!1sAF1QipMReW2qMrZ3-KPSRjiUbKNo19BNk1Yk11jwCtZp!2e10!6shttps:%2F%2Flh5.googleusercontent.com%2Fp%2FAF1QipMReW2qMrZ3-KPSRjiUbKNo19BNk1Yk11jwCtZp%3Dw365-h486-k-no!7i3096!8i4128!4m3!8m2!3m1!1e1?entry=ttu, last accessed February 23, 2024.



311.    Upon information and belief, Defendant Gorayeb PC maintains involvement in other facilities that provide Spanish-language OSHA courses.

312.    Defendant Gorayeb PC's involvement with Spanish-language OSHA classes and requests by Defendants Payano and Guadalupe to contact them in the event of alleged accident underscore how each enterprise is able to quickly take root following a hospital visit.

## B. THE OVERARCHING ENTERPRISE AND APPLICATION TO THE CLAIMANT ENTERPRISES DELINEATED HEREIN

313.    As set forth herein, while each claimant constitutes a separate and distinct enterprise in which Defendants conspired to commit multiple counts of mail and/or wire fraud during multiple phases of each scheme, the recurring application of grooming, steering claimants towards a plurality of Defendant medical providers and specific Workers' Compensation law firms constitutes its own overarching enterprise.

314.    The cumulative efforts of Defendants to infiltrate community organizations and courses intended to instruct workers in OSHA safety, to purchase ambulatory surgery centers in order to provide safe havens for the unnecessary injections and surgeries necessary to maximize recovery on the series of Claimant Enterprises listed herein and others, all of which necessarily revolve around the submission of fraudulent bills and medical reports via the U.S. mail and/or electronically in the streams of interstate commerce underscore the nature of the overarching enterprise, though its full contours and extent are not known to Plaintiffs at this time.

315.    The Claimants' respective medical records are attached hereto as Exhibits J-1.1, through J-4.6, respectively, and incorporated herein by reference.

316.    Plaintiffs sought and obtained review of said records, along with documents submitted to court, by qualified medical experts who reside and practice entirely outside of the regions at issue and are not beholden to any party with respect to claims arising under New York State Workers' Compensation Law, Labor Law or similar tort matters.

317.    As set forth in their respective sworn affidavits attached hereto and incorporated herein as Exhibits K-1 and K-2, respectively, Neuroradiologist Geoffrey A. Negin MD and orthopedic surgeon Anton Y. Jorgensen, MD, reviewed the medical records for all four claimants.

318.    While not opining outside of his specialty, Dr. Negin found the alleged injuries and surgeries did not appear causally related to the alleged incidents, and further that since the radiologic reports materially conflicted with the images themselves which showed degenerative conditions, "if surgery is being performed with incorrect radiologic reports that are inconsistent and in some instances, opposite to radiologic images, I find it hard to believe that surgery may be warranted. Of importance too, with regard to these claimants, many of the radiologic findings are degenerative in nature and wholly unrelated to the accidents alleged." *See* Exhibit K-1 at p. 13.

319.    Dr. Jorgensen's conclusion was even more damning both with respect to reliance upon incorrect imaging reports and the lack of medical necessity overall:

> ""It is my area of expertise to opine whether certain surgeries were warranted in any of these instances based on the medical records and imaging and found in more than one case, they were not. No physician should be performing operations on patients without a medical need for such. One doctor in particular, Dr. Andrew Merola did such as such, it my duty to report him to the relevant medical board for further investigation. Any surgery being performed with incorrect radiologic reports that are inconsistent and in some instances, opposite to radiologic images, I find it hard to believe that surgery may be warranted. Of importance too, with regard to these claimants, many of the radiologic findings are degenerative in nature and wholly unrelated to the accidents alleged."

 *See* Exhibit K-2 at p. 16.

320.    Kate Glywasky, Psy.D., ABPP is a Neuropsychologist and licensed Clinical Psychologist who evaluated the claimants in both capacities. With respect to Claimants A, B and C, she found that none suffered any cognitive or neuropsychologic injury as a result of their alleged accidents and there is nothing in the medical records to suggest that any of them incurred any mental health issues elevated above normal everyday stressors that would suggest one to conclude, in all reasonable medical probability, that they incurred any mental health damages as a result of the alleged accident. *See* Exhibit K-3, attached hereto and incorporated herein by reference.

321.     With respect to Claimant D, Dr. Glywasky found that this Claimant's reported psychological testing was "cursory in nature," that he was already taking antidepressants, and found it "odd" that "no other records relate such complaints and that such seem to be relayed by Patient D as though read from an article on signs and symptoms of depression." *Id* at p. 19.

322.     Dr. Glywasky therefore concluded that "there is no evidence of that would lead one to conclude, in all reasonable medical probability, that Patient D suffered any cognitive or neuropsychologic injury as a result of this alleged accident." *Id*.

323.     Since Claimant C's Defendant Providers belatedly alleged that he suffered a traumatic brain injury ("TBI"), Plaintiffs additionally sought the expert review of neurologist Stephen L. Nelson, MD, Ph.D. on that claim. *See* Exhibit K-4, attached hereto and incorporated herein by reference.

324.     Following his review, Dr. Nelson pertinently stated that "I find absolutely no evidence of head trauma or traumatic brain injury. Had there been an issue one would have thought it would have been documented somewhere within 1.5 years of the accident. I see none. Moreover, had there been an issue, certainly one of the medical providers Claimant C went to would have ordered testing or made a note. There was none." *Id* at p. 9.

325.     Dr. Nelson therefore concluded as follows:

"Based on medical education, training and experience and the foregoing records, Claimant C had no definitive cognitive, neurologic evaluation that would meet the standard of care. At a minimum, Claimant C could have undergone a full neurologic work-up including diagnostic imaging, a full and complete medical history, and cognitive, neuropsychologic testing. He has never undergone these to my knowledge.  Based on the records I have reviewed to date, there is absolutely no evidence, in all reasonable medical probability, that Claimant C suffered from a TBI as a result of the accident at issue. Once again, such is so far removed from the date of the accident to be causally related, if any of this is true."

*Id* at p. 11.

326.   Due to the foregoing, while the implementation of the fraudulent treatment protocol was sufficient to present facially valid treatment, it does not stand up to focused expert scrutiny of the precise kind that is simply impracticable to obtain within the narrow window set forth by the timeframes of a Workers' Compensation action.

## C.  JUSTIFIABLE RELIANCE BY TRADESMAN

327.   Tradesman and third-party claims administrators whom it retains to adjust claims is under statutory obligation to promptly and fairly pay or object to bills within 45 days. N.Y.W.C.L. § 13-g(1).

328.   The bills and supporting documents Defendants submitted and caused to be submitted in support of the fraudulent charges at issue to both the Board and to Tradesman, combined with the material misrepresentations described above, were designed to and did cause Tradesman to justifiably and reasonably rely on them. The ring of putative conservative care providers and their coconspirator consulting medical professionals created a self-justifying circle of medical justification for all alleged treatment and procedures that could not be readily unraveled.

329.   As part of their respective licensures, all Defendants are obligated legally and ethically to act with integrity. Instead, Defendants submitted or caused to be submitted bills and supporting documentation that are fraudulent in that they represent claims and services as if they were performed and were medically necessary when, in fact, they were not.

330.   Further, the success of Defendants' scheme depends on identifying alleged claims that could thereafter be substantially expanded and utilizing the Fraudulent Treatment Protocol designed to mimic legitimate claims and treatment in order to obtain determinations by the New

York State Workers' Compensation Board and other authorizations which result in payments and favorable administrative decisions.

331.   By design, no single medical note and bill, or even group of bills within a single claim, readily reveals its fraudulent nature. To the contrary, N.Y.W.C.L. § 21(5) mandates the express presumption "[t]hat the contents of medical and surgical reports introduced in evidence by claimants for compensation shall constitute prima facie evidence of fact as to the matter contained therein."

332.   Tradesman justifiably relied upon this legal presumption, unaware that the cycle of self-perpetuating fraud was in fact driving the alleged medical treatment of these claims and the tort actions thereafter.

333.   As a result, Tradesman has incurred damages in excess of $1,000,000.00, as set forth in Exhibits A-1 through A-4, as well as considerable additional expenses incurred in adding additional staff to respond to, identify, and address the fraud, the exact amount to be determined at trial.

334.   As noted, Roosevelt is facing general liability exposure as the direct and proximate result of this pattern of fraudulent activity on the four Claimant Enterprises alone between $6 million and $12 million.

**V.**

**CAUSES OF ACTION**

**FIRST CLAIM FOR RELIEF:**
**COMMON LAW FRAUD**
**(Against All Defendants)**

335.   Tradesman and Roosevelt adopt and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 334 above, which are incorporated herein by reference.

336.   Defendants, acting in concert and with a common purpose or plan relative to each enterprise set forth above, intentionally and knowingly made false and fraudulent statements of material fact to Tradesman and to the New York State Workers' Compensation Board ("Workers' Compensation Board") by submitting or causing to be submitted bills and supporting documentation that contained false representations of material fact concerning patients treated or allegedly treated by medical providers who are named Defendants in this cause of action, and ultimately forced to undergo procedures at facilities owned by Ambulatory Surgery Center Defendants.

337.   The false statements of material fact include the representations in each and every claim described in the charts attached hereto as Exhibits B-1 through B-4, attached hereto and incorporated herein by reference that: 1) patients were legitimately examined and tested to determine the true nature and extent of their injuries, when they were not; 2) each patient's condition was related to a workplace/construction accident and no other contributing factors, when these Defendants did not legitimately reach such conclusions; and 3) the services were performed,

provided, medically necessary, and/or reimbursable, when, in fact, they either were not provided, not medically necessary, and/or not reimbursable.

338.   Defendants knew that the above-described misrepresentations made to the Workers' Compensation Board and to Tradesman relating to the purported examinations, treatment, testing, injections, and supplies were false and fraudulent when they were made.

339.   Defendants made the above-described misrepresentations and engaged in such conduct to induce Tradesman into relying on the misrepresentations, and thereafter to obtain windfall tort recoveries ultimately from Roosevelt.

340.   As a result of its justifiable reliance on Defendants' misrepresentations, Tradesman has incurred damages in excess of $1,000,000.00, along with the loss of business revenue proximately caused by the cessation of insurance clients who no longer write policies in the State of New York due to the cumulative effect of the fraudulent activities detailed herein.

341.   As a result of Defendants' pattern of fraudulent activities, Roosevelt is facing general liability exposure on the four Claimant Enterprises alone between $6,000,000.00 and $12,000,000.00, the precise amount to be determined at trial.

WHEREFORE, Tradesman and Roosevelt demand judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

## SECOND CLAIM FOR RELIEF:
## AIDING AND ABETTING FRAUD
### (Against All Defendants)

342.   Tradesman and Roosevelt adopt and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 341 above, which are incorporated herein by reference.

343.   Defendants conspired, agreed to, and acted in concert to defraud Tradesman, and did defraud Tradesman, through the submission of false and fraudulent statements of material fact to Tradesman as described above in the First Claim for Relief, and with intent to defraud Roosevelt thereafter.

344.   Defendants substantially assisted in defrauding Tradesman with intent to defraud Roosevelt thereafter. Defendants submitted or caused to be submitted bills and supporting documentation that contained false and fraudulent misrepresentations of material fact to Tradesman and to the New York State Workers' Compensation Board to individually and collectively benefit from determinations made by Tradesman, its third-party administrators and the Board based on the false information provided.

345.   The false and fraudulent statements of material fact include the representations in each and every claim enterprise described herein that: 1) patients were legitimately examined and tested to determine the true nature and extent of their injuries, when they were not; 2) each patient's condition was related to a workplace/construction accident and no other contributing factors, when these Defendants did not legitimately reach such conclusions; and 3) the services and surgeries were performed, were provided, were medically

necessary and/or were reimbursable, when, in fact, they either were not provided, not medically necessary, and/or not reimbursable.

346.   Defendants knew that the above-described misrepresentations made to Tradesman and to the Workers' Compensation Board relating to the purported examinations, treatment, testing, injections, and surgeries were false and fraudulent when they were made.

347. Defendants made the above-described misrepresentations and engaged in such conduct to induce Tradesman into relying on the misrepresentations.

348.   As a result of their justifiable reliance on Defendants' misrepresentations, Tradesman has incurred damages in excess of $1,000,000.00, along with the loss of business revenue proximately caused by the cessation of insurance clients who no longer write policies in the State of New York due to the cumulative effect of the fraudulent activities detailed herein.

349.   As a result of Defendants' pattern of fraudulent activities, Roosevelt is facing general liability exposure on the four Claimant Enterprises alone between $6,000,000.00 and $12,000,000.00.

WHEREFORE, Tradesman and Roosevelt demand judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

### THIRD CLAIM FOR RELIEF:
### RICO VIOLATION OF 18 U.S.C. § 1962(c)
### (Against All Defendants)

350. Tradesman and Roosevelt adopt and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 349 above, which are incorporated herein by reference.

351.   Plaintiffs constitute "persons" as defined by 18 U.S.C. § 1961(3), who have been and will imminently be harmed in their businesses and/or properties by reason of Defendants' conduct.

352.   Defendants constitute an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce. The members of each enterprise are and have been joined in a common purpose, namely, to defraud Tradesman by submitting, and causing to be submitted, bills and supporting documentation that are fraudulent for services and surgeries that were not provided, were not medically necessary, and/or were not legitimately entitled to reimbursement for patients treated by medical providers or at ambulatory surgery center facilities which are named Defendants. Although different members have performed different roles at different times, they have operated as a continuing unit with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose — to defraud Tradesman by fraudulent Workers' Compensation claims — with sufficient longevity to accomplish that common purpose. the fraudulent nature of the claims, and to reap substantial profits. Each Defendant's participation and role was necessary to the success of the scheme. No one Defendant was capable of carrying out the scheme without the participation of the other Defendants.  Defendants have acted with sufficient longevity to achieve their common goal of defrauding Tradesman through fraudulent Workers' Compensation claims.

353.   Defendants have knowingly conducted and/or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United

States mails to submit to Tradesman and to the New York State Workers' Compensation Board bills and supporting documentation that are fraudulent in that:

    a.  patients were not legitimately examined and tested to determine the true nature and extent of their injuries;

    b.  each patient's condition was represented to be related to a workplace / construction accident and no other contributing factors, when Defendants did not legitimately reach such conclusions; and

    c.  the examinations, diagnoses, treatment, testing and surgeries which were medically unnecessary, not provided, and/or not reimbursable, including but not limited to, all bills and supporting documentation submitted to Tradesman for claims referenced herein.

354.   Tradesman has been injured in its business and property by reason of Defendants' above-described conduct in that it collectively has paid more than $1,000,000.00 based upon the fraudulent charges, along with the loss of business revenue proximately caused by the cessation of insurance clients who no longer write policies in the State of New York due to the cumulative effect of the fraudulent activities detailed herein.

355.   As a result of Defendants' pattern of fraudulent activities, Roosevelt is facing general liability exposure as the direct and proximate result of this pattern of fraudulent activity on the four Claimant Enterprises alone between $6,000,000.00 and $12,000,000.00.

356.   Workers' Compensation and Labor Law tort fraud schemes practiced here and elsewhere have a deleterious impact on the construction industry's insurers' overall financial well-

being and adversely affect insurance rates that in turn adversely impact the construction industry as well.

WHEREFORE, Roosevelt and Tradesman demand judgment against Defendants for violations of 18 U.S.C. § 1962(c) for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), plus interest, and any other relief the Court deems just and proper.

**FOURTH CLAIM FOR RELIEF:**
**RICO CONSPIRACY VIOLATION OF 18 U.S.C. § 1962(d)**
**(Against All Defendants)**

357.   Tradesman and Roosevelt adopt and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 356 above, which are incorporated herein by reference.

358.   Defendants have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of each enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit to Tradesman and to the New York State Workers' Compensation Board, and other insurers and entities, bills and supporting documentation that are fraudulent for examinations, treatments, testing, injections, and surgeries which were medically unnecessary, not provided, and/or not reimbursable, including, but not limited to, all bills and supporting documentation submitted to Tradesman for claims referenced herein.

359.   Each of the Defendants knew of, agreed to, and acted in furtherance of the common and overall objective of the conspiracy by facilitating the submission of bills and supporting documentation that are fraudulent for examinations, diagnoses, treatments, testing, and supplies, which were medically unnecessary, not provided, and/or not reimbursable, to Tradesman.

360.   Tradesman has been injured in its business and property by reason of Defendants' above-described conduct in that it collectively has paid more than $1,000,000.00 based upon the fraudulent charges, along with the loss of business revenue proximately caused by the cessation of insurance clients who no longer write policies in the State of New York due to the cumulative effect of the fraudulent activities detailed herein.

361.   Workers' Compensation and Labor Law tort fraud schemes practiced here and elsewhere have a deleterious impact on the construction industry's insurers' overall financial well-being and adversely affect insurance rates that in turn adversely impact the construction industry as well.

WHEREFORE, Tradesman and Roosevelt demand judgment against Defendants for violations of 18 U.S.C. § 1962(d) for compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief the Court deems just and proper.

## FIFTH CLAIM FOR RELIEF:
## UNJUST ENRICHMENT
## (Against All Defendants)

362.   Tradesman and Roosevelt Tradesman and Roosevelt adopt and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 361 above, which are incorporated herein by reference.

363.   Tradesman conferred a benefit upon the Defendants by paying Defendants' claims for services purportedly provided to patients treated by medical providers who are named Defendants, as well as additional statutory attorneys' fees to attorneys who are named Defendants, and these Defendants voluntarily accepted and retained the benefit of those payments.

364.   Because the Defendants knowingly billed for and/or received money for services that were not medically necessary, not provided, and/or not reimbursable, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

365.   As a direct and proximate result of the above-described conduct of Defendants, Tradesman has been damaged and Defendants have been enriched by more than $1,000,000.00.

366.   As a result of Defendants' pattern of fraudulent activities, Roosevelt is facing general liability exposure on the four Claimant Enterprises alone between $6,000,000.00 and $12,000,000.00.

367.   Retention of those benefits by Defendants would violate fundamental principles of justice, equity, and good conscience.

WHEREFORE, Tradesman and Roosevelt demand judgment against the Defendants for compensatory damages, plus interest and costs, and for such other relief as the Court deems equitable, just, and proper.

### SIXTH CLAIM FOR RELIEF:
### DECLARATORY JUDGMENT
### (Against All Provider Defendants)

368.  Tradesman and Roosevelt Tradesman and Roosevelt adopt and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 367 above, which are incorporated herein by reference.

369.  This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

370.  There is an actual case and controversy between Tradesman and Roosevelt, on the one hand, and the Defendants on the other hand, as to all charges for examinations, treatments, testing, injections, and surgeries that have not been paid to date and through the pendency of this litigation. Tradesman and Roosevelt contend these Defendants are not entitled to reimbursement for any of these charges.

371.  Because these Defendants have made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim submitted to Tradesman, and thereafter relied upon in each action brought in which Roosevelt is the reinsuring entity ultimately responsible for payment, these Defendants are not entitled to any reimbursement for alleged services relating to any of the claims at issue.

372.   By virtue of the declaratory judgment stating that the provider Defendants are not entitled to any reimbursement for alleged services relating to any of the claims at issue, any and all fees purportedly or proximately otherwise recoverable by the attorney Defendants are necessarily rendered a nullity.

WHEREFORE, Tradesman and Roosevelt respectfully request a judgment declaring that Defendants are not entitled to collect for any charges relating to examinations, treatments, testing, injections, and surgeries that have not been paid to date and through the pendency of this litigation; and for supplementary relief, attorneys' fees, interest, and costs as this Court deems equitable, just and proper.

### SEVENTH CLAIM FOR RELIEF:
### RICO CONSPIRACY VIOLATION OF 18 U.S.C. § 1341 – Mail Fraud.
### (Against All Defendants)

373.   Tradesman and Roosevelt Tradesman and Roosevelt adopt and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 372 above, which are incorporated herein by reference.

374.   Defendants have individually and collectively knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use or intent to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of the mail, by submitting to the New York State Workers' Compensation Board and to Tradesman and other insurers bills and supporting

documentation that are fraudulent for examinations, treatments, testing, injections, and surgeries which were medically unnecessary, not provided, and/or not reimbursable, including, but not limited to, all bills and supporting documentation submitted to Tradesman for claims referenced herein, which were intended to and resulted in the mailing of checks by or on behalf of Tradesman by Gallagher Basset pursuant to contract from its California office as set forth in Exhibits A-1, A-2, A-3, and A-4. All such Exhibits are attached hereto and incorporated herein by reference.

### EIGHTH CLAIM FOR RELIEF:
### RICO CONSPIRACY VIOLATION OF 18 U.S.C. § 1343:
### Fraud by Wire, Radio, or Television.
### (Against All Defendants)

375.   Tradesman and Roosevelt Tradesman and Roosevelt adopt and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 374 above, which are incorporated herein by reference.

376.   Defendants have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon the use or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, by submitting to the New York State Workers' Compensation Board and to Tradesman and other insurers bills and supporting documentation that are fraudulent for examinations, treatments, testing, injections, and surgeries which were medically unnecessary, not provided, and/or not reimbursable, including, but not limited to, all bills and supporting

documentation submitted to Tradesman for claims referenced herein attached hereto and incorporated herein by reference.

377.    Defendants' commission of fraud by means of wire, radio or television via submission of Workers' Compensation bills and reports specifically includes but is not limited to submission of same pursuant to New York State Workers' Compensation Board's "COVID-19 Guidance: Submitting Medical Bills and Attached Reports" (the title of which was subsequently changed to  "WCB COVID-19 Guidance: Attaching Medical Bills to Form C-8.1B", issued on April 9, 2020 which directed use of either the online case folder or email submission to wcbclaimsfiling@wcb.ny.gov. *See* https://www.wcb.ny.gov/content/main/TheBoard/COVID-19-C-8_1-form-submissions.jsp, last accessed February 26, 2024, and incorporated herein by reference.

378.   Defendants knowingly solicited payments that were issued via ACH by Gallagher Bassett pursuant to its contract with Tradesman from its California office, thereby further constituting wire fraud committed across state lines as set forth in Exhibits A-1, A-2, A-3 and A-4 attached hereto and incorporated herein by reference.

### NINETH CLAIM FOR RELIEF:
### CONSPIRACY VIOLATION OF NY PENAL LAW § 460.20:
### Enterprise Corruption
### (Against All Defendants)

379.   Tradesman and Roosevelt adopt and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 378 above, which are incorporated herein by reference.

380.   While not independently privately actionable under New York State Law at this time, Defendants have knowingly engaged in enterprise corruption as defined by state law by having knowledge of the existence of a criminal enterprise and the nature of its activities and being employed by or associated with such enterprise by conduct and participation in a pattern of criminal activity. Namely Defendants participated in a pattern of criminal activity by submitting fraudulent bills for examinations, treatments, testing, and injections and supplies. Since Defendants knowingly submitted fraudulent claims and misrepresented the extent of injuries and concealed material facts regarding said injuries, such enterprise exists, and constitutes an additional basis on which this Honorable Court may render judgment in Plaintiffs' favor.

381.   The Gorayeb PC and Sisa Pakari Defendants' collusion in producing unqualified individuals to provide inadequate OSHA safety instruction further constitutes prima facie evidence of enterprise corruption as per Manhattan's District Attorney.

**TENTH CLAIM FOR RELIEF**
**CONSPIRACY VIOLATION OF NY PENAL LAW § 170.10**
**Forgery in the Second Degree**
**(Against All Defendants)**

382.   Tradesman and Roosevelt adopt and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 381 above, which are incorporated herein by reference.

383.   Defendants have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of each enterprise's affairs through a pattern to defraud, deceive, or injure another when Defendants falsely made, completed, or altered a written instrument and completed a public record and filed such instrument with a public office, namely

the New York State Workers' Compensation Board, whether by regular mail, electronic mail or use of the online case folder maintained by said Board.

### ELEVENTH CLAIM FOR RELIEF
### CONSPIRACY VIOLATION OF NY PENAL LAW § 175.10
### Falsifying Business Records in the First Degree
### (Against All Defendants)

384.   Tradesman and Roosevelt adopt and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 383 above, which are incorporated herein by reference.

385.   Defendants have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of each enterprise's affairs through a pattern to falsify business records when Defendant's intent to defraud included an intent to commit deceive, or injure another when Defendants falsely made, when their individual and collective intent to defraud includes an intent to commit another crime or to aid or conceal the commission thereof. Namely, falsifying medical bills, treatment record documents and any other invoices and/or records related to the fraudulent medical treatment in the Defendant's causes of actions, which were presented to the New York State Workers' Compensation Board, Tradesman and others similarly situated, and then filed to the New York State Courts Electronic Filing (NYSCEF) system under the guise of legitimate treatment records and billing.

386.   Defendants' submission of false medical records in order to support their fraudulent claim constitutes a sufficient basis for criminal indictment in the State of New York under section 175.10 of the New York State Penal Law. *People v. Kisina*, 14 N.Y.3d 153 (2010).

## TWELFTH CLAIM FOR RELIEF
## CONSPIRACY VIOLATION OF NY PENAL LAW § 190.65
### Scheme to Defraud in the First Degree
### (Against All Defendants)

387.   Tradesman and Roosevelt adopt and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 386 above, which are incorporated herein by reference.

388.   Defendants have knowingly agreed and conspired to conduct and/or participate in a scheme to defraud in the first degree when Defendants engaged in a scheme constituting a systematic ongoing course of conduct with intent to defraud more than one person or to obtain property from more than one person by false or fraudulent pretenses, representations or promises, and so obtained property with a value in excess of one thousand dollars from one or more such persons.

## THIRTEETH CLAIM FOR RELIEF
## CONSPIRACY VIOLATION OF NY PENAL LAW § 349
### Deceptive Acts and Practices Unlawful
### (Against All Defendants)

389.   Tradesman and Roosevelt adopt and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 388 above, which are incorporated herein by reference.

390.   Defendants have knowingly conducted deceptive acts or practices in the conduct of business, trade or commerce. Namely, Defendants falsely charged and submitted bills for examinations, treatments, testing, injections, and surgeries that were unnecessary, unrelated to the alleged incidents claimed and/or not performed. Plaintiffs therefore contend these Defendants are

not entitled to reimbursement for any of these charges through direct reimbursement pursuant to statute or derivative administratively or judicially obtained awards or judgments thereafter.

391.    Because these Defendants have made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim submitted to Tradesman, these Defendants are not entitled to any reimbursement for any of the claims at issue, whether before an administrative agency of the State of New York or via New York State's judicial system.

392.    Tradesman has been injured by Defendants' systemic deceptive practices, and are therefore additionally entitled to enjoin said practices, recover its damages up to one thousand dollars and reasonable attorneys' fees pursuant to New York Penal Law § 349(h).

## V.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

## VI.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, PLAINTIFFS **ROOSEVELT ROAD RE, LTD.** and **TRADESMAN PROGRAM MANAGERS, LLC** pray the Court enter Judgment against Defendants as identified herein, for damages as set forth herein and as proven at trial, including treble damages, a declaratory judgment, and such other and further relief, at law or in equity to which Plaintiffs may show themselves justly entitled.

Respectfully submitted,

**THE WILLIS LAW GROUP, PLLC**

By: /s/ *Michael A. Graves*

**AARON E. MEYER**
ameyer@thewillislawgroup.com
**KIRK D. WILLIS** *(admission pending)*
kwillis@thewillislawgroup.com
**MICHAEL A. GRAVES**
mgraves@thewillislawgroup.com
**WILLIAM J. CLAY** *(admission pending)*
wclay@thewillislawgroup.com
1985 Forest Lane
Garland, Texas 75042
Telephone: 214-736-9433
Facsimile: 214-736-9994
Service Email: service@thewillislawgroup.com

**ATTORNEYS FOR THE PLAINTIFFS**
**ROOSEVELT ROAD RE, LTD. AND**
**TRADESMAN PROGRAM MANAGERS, LLC**

Dated: February 29, 2024