<div align="center">

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

</div>

**ROOSEVELT ROAD RE, LTD. and**
**TRADESMAN PROGRAM MANAGERS, LLC,**

          **Plaintiffs,**     **Case 1:24-cv-01549-NG-LB**

**v.**

**SURGICARE OF WESTSIDE, LLC; SIDDHARTHA SHARMA, DPM; SURGICORE 5TH AVENUE LLC a/k/a and b/s/a FIFTH AVENUE SURGERY CENTER, LLC; NY ORTHO, SPORTS MEDICINE & TRAUMA, P.C.; JEFFREY STONE KAPLAN, MD; MATTHEW P. GRIMM, MD; ADRIAN PUIA, RPT; JOSEPH WEINSTEIN, D.O., P.C.; JOSEPH WEINSTEIN, DO; ANDREW MEROLA, MD; KOLB RADIOLOGY P.C.; THOMAS M. KOLB, MD; LENOX HILL RADIOLOGY AND MEDICAL IMAGING ASSOCIATES, P.C.; FOGELGAREN FORMAN & BERGMAN, LLP; ERIC FOGELGAREN; JONATHAN FORMAN; ROBERT BERGMAN; GORAYEB & ASSOCIATES, PC; and CHRISTOPHER J. GORAYEB**

         **Defendants.**

---

<div align="center">

**FIRST AMENDED COMPLAINT**

</div>

---

Plaintiffs ROOSEVELT ROAD RE, LTD. (hereinafter referred to as "Roosevelt") and TRADESMAN PROGRAM MANAGERS, LLC (hereinafter referred to as "Tradesman") (collectively referred to hereinafter as "Plaintiffs") by and through their attorneys THE WILLIS LAW GROUP, LLC, allege as follows:

**I.**  **JURISDICTION AND VENUE**

1. This is a civil action arising out of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.* This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964, and 28 U.S.C. § 1331 in that certain of the claims arise

under the laws of the United States and over other claims herein under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2.   Venue is proper in this District under and pursuant to 18 U.S.C. § 1965, and pursuant to 28 U.S.C. § 1391, in that numerous of the acts, practices, and events giving rise to the claims alleged in this Complaint occurred in this District, and many of the Defendants reside in this District.

## II.   THE PARTIES

### A.   Plaintiffs

3.   Plaintiff Roosevelt Road Re, Ltd. is a foreign limited company duly organized and existing under the laws of Bermuda. At all times relevant herein, Roosevelt was authorized to conduct business in New York.

4.   Plaintiff Tradesman Program Managers, LLC is a limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, Tradesman maintained its principal place of business in the State of New York and is authorized to conduct business in New York.

### B.   Defendants

#### i.   Legal Services Defendants

5.   Defendant GORAYEB & ASSOCIATES, P.C. ("Gorayeb Firm") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, the Gorayeb Firm maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

6.   Upon information and belief, Defendant CHRISTOPHER J. GORAYEB ("Gorayeb" and together with Gorayeb Firm, the "Gorayeb Defendants") resided in and was a citizen of the State of New Jersey. He is a named partner and sole shareholder of the

Gorayeb Firm. At all times relevant herein, Gorayeb was licensed or otherwise authorized to practice law in the State of New York and was employed in the State of New York.

7. Defendant FOGELGAREN FORMAN & BERGMAN, LLP ("Fogelgaren Firm") is a limited liability partnership duly organized and existing under the laws of the State of New York. At all times relevant herein, the Fogelgaren Firm maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

8. Upon information and belief, Defendant ERIC FOGELGAREN ("Fogelgaren") resides in and is a citizen of the State of New York. He is also a named partner of, and upon information and belief, a managing partner of the Fogelgaren Firm. At all times relevant, Fogelgaren was licensed or otherwise authorized to practice law in the State of New York.

9. Upon information and belief, Defendant JONATHAN FORMAN ("Forman") resides in and is a citizen of the State of New York. He is also a named partner of, and upon information and belief, a managing partner of the Fogelgaren Firm. At all times relevant, Forman was licensed or otherwise authorized to practice law in the State of New York

10. Upon information and belief, Defendant ROBERT BERGMAN ("Bergman" and together with Fogelgaren Firm, Fogelgaren, and Forman, the "Fogelgaren Defendants") resided in and was a citizen of the State of New York until he relocated and now resides in and is a citizen of the State of Florida. Although Bergman is now retired, he was a named partner of the Fogelgaren Firm, and upon information and belief, was also a

managing partner of the Fogelgaren Firm during all times relevant. At all times relevant, Forman was licensed or otherwise authorized to practice law in the State of New York.

11. The Fogelgaren Defendants and the Gorayeb Defendants are collectively referred to herein as the "Legal Service Defendants."

    ii.    <u>Medical Provider Defendants</u>

12. Defendant NY ORTHO, SPORTS MEDICINE & TRAUMA, P.C. ("NY Ortho") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, NY Ortho maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

13. Upon information and belief, Defendant JEFFREY STONE KAPLAN, MD ("Kaplan") resides in and is a citizen of the State of New York. At all relevant times, Kaplan has been licensed or otherwise authorized to practice medicine in the State of New York and/or State of New Jersey and was an owner, operator, officer, director and/or employee of NY Ortho.

14. Upon information and belief, Defendant MATTHEW P. GRIMM, MD ("Grimm"), resides in and is a citizen of the State of New York. At all relevant times, Grimm has been licensed or otherwise authorized to practice medicine in the State of New York and/or State of New Jersey and was an owner, operator, officer, director and/or employee of NY Ortho.

15. Upon information and belief, Defendant ADRIAN PUIA, RPT ("Puia" and together with NY Ortho, Kaplan and Grimm, the "NY Ortho Defendants") resides in and is a citizen of the State of New York. At all relevant times, Puia has been licensed or

otherwise authorized to practice as a physical therapist in the State of New York and was an owner, operator, officer, director and/or employee of NY Ortho.

16. Defendant JOSEPH WEINSTEIN, D.O., P.C. d/b/a Comprehensive & Orthopedic Spine Care ("Weinstein Practice") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, the Weinstein Practice, maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

17. Upon information and belief, Defendant JOSEPH WEINSTEIN, DO ("Weinstein" and together with Weinstein Practice, the "Weinstein Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Weinstein has been licensed or otherwise authorized to practice medicine in the State of New York and/or State of New Jersey and was the owner, operator, officer, director and/or employee of the Weinstein Practice.

18. Upon information and belief, Defendant ANDREW MEROLA, MD ("Merola"), resides in and is a citizen of the State of New York. At all relevant times herein, Merola has been licensed or otherwise authorized to practice medicine in the State of New York and/or State of New Jersey.

19. Defendant KOLB RADIOLOGY P.C. ("Kolb Practice") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, the Kolb Practice maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

20. Upon information and belief, Defendant THOMAS M. KOLB, MD ("Kolb" and together with Kolb Practice, the "Kolb Defendants") resides in and is a citizen of the

State of New York. At all relevant times herein, Kolb has been licensed or otherwise authorized to practice medicine in the State of New York and/or State of New Jersey and was the owner, operator, officer, director and/or employee of the Kolb Practice.

21. Defendant LENOX HILL RADIOLOGY AND MEDICAL IMAGING ASSOCIATES, P.C. ("Lenox Practice"), is a professional corporation duly organized and existing under the laws of the State of New York.  At all times relevant herein, the Lenox Practice maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

22. Defendant SURGICARE OF WESTSIDE, LLC ("SOW") is a limited liability company duly organized and existing under the laws of the State of New York.  At all times relevant herein, SOW maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

23. Upon information and belief, Defendant SIDDHARTHA SHARMA, DPM ("Sharma") resides in and is a citizen of the State of New York. At all relevant times, Sharma has been licensed or otherwise authorized to practice medicine in the State of New York and/or State of New Jersey.

24. Defendant SURGICORE 5TH AVENUE LLC ("S5A") is a limited liability company duly organized and existing under the laws of the State of New York and also known as and doing business as Fifth Avenue Surgery Center, LLC, also a limited liability company duly organized and existing under the laws of the State of New York.  At all times relevant herein, S5A maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

25. The NY Ortho Defendants, the Weinstein Defendants, Merola, the Kolb Defendants, the Lenox Practice, Sharma, SOW and S5A are collectively referred to herein as the "Medical Provider Defendants."

26. The Legal Service Defendants and the Medical Provider Defendants are collectively referred to herein as "Defendants."

## III.   FACTUAL BACKGROUND

### A.   Fraud Scheme

27. From at least 2018 to the present, Defendants, together with others known and unknown, for their financial benefit, orchestrated a widespread fraud scheme to defraud Plaintiffs and others by (i) unlawfully grooming and recruiting construction workers into staging and perpetuating fake construction accidents that occurred in New York; (ii) preparing and collecting documentation as well as submitting, filing, prosecuting and asserting fraudulent workers' compensation claims and personal injury lawsuits on behalf of such construction workers; (iii) providing or alleging to have provided medically unnecessary and excessive healthcare services to such construction workers; and/or (iv) using the fraudulent diagnoses and medically unnecessary and excessive healthcare services to inflate settlement value (the "Fraud Scheme").

28. The Defendants together constituted an association-in-fact enterprise generally structured as depicted below in Figure 1:

**Figure 1.**

Gorayeb Firm and Gorayeb – sponsor of OSHA training and Runners to recruit Claimants and represent Claimants in personal injury lawsuits.
Runners – through OSHA training, recruit Claimants
Fogelgaren Firm and Fogelgaren, Forman and Bergman – represent Claimants in parallel workers' compensation claim
Claimants – non-English speaking; either stage accidents or exaggerate accidents/injuries
Medical Provider Defendants – provide and seek reimbursement for fraudulent medical treatment/services to Claimants, which also inflates settlement value
S5A – operation facility for Claimants
NY Ortho and Kaplan, Grimm and Puia – physical therapy, pain management and surgery for Claimants
SOW – operation facility for Claimants
Merola – surgery for Claimants
Weinstein Practice and Weinstein – surgery for Claimants
Sharma – surgery for Claimants
Kolb Practice and Kolb – radiology for Claimants
Lenox Practice – radiology for Claimants



30. Generally, as part of the Fraud Scheme, individuals known as "runners" ("Runners"), under the sponsorship and direction of the Gorayeb Defendants and in furtherance of the Fraud Scheme, conducted Spanish-language OSHA training required to work on construction projects and recruited construction workers ("Claimants") into staging and/or perpetuating fake construction accidents at various construction sites throughout New York.

31. On information and belief, as part of the recruitment process, Claimants were told that they would be paid for not working if they had a workplace injury. Further the amount of their economic benefits would increase if they had surgeries or rehabilitation and that the economic benefits could continue for 225 weeks or more.

32. Regardless of any actual bodily injury stemming from the purported construction accidents, these Claimants were instructed by the Runners, under the direction of Gorayeb Defendants and on behalf of the Defendants, to fake and claim certain bodily injuries that purportedly resulted from such accidents and to seek medical treatment.

33. The Runners then referred and/or transported these Claimants to the Gorayeb Firm, where attorneys and/or other employees of the Gorayeb Firm met with these Claimants.

34. In return, the Runners generally received a referral fee for such referral.

35. The Gorayeb Firm represented the Claimants in personal injury lawsuits against the various parties involved with the construction project (*e.g.*, owner, general contractor, construction manager, etc.) for purported injuries that resulted from accidents on the construction projects.

36. For workers' compensation claims made to the New York State Workers' Compensation Board ("NY WCB"), the Fogelgaren Firm represented the Claimants for the same purported injuries that resulted from accidents on the construction projects.

37. The Fogelgaren Firm's office and Gorayeb Firm's office are located on the same floor of the same building – the 19th floor of the building at 100 William St., New York, New York 10038. Fogelgaren Defendants and Gorayeb Defendants had an agreement and understanding that Fogelgaren Firm would represent Claimants in workers' compensation claims and Gorayeb Firm would represent Claimants in personal injury lawsuits, in furtherance of the Fraud Scheme.

38. For most Claimants, both personal injury lawsuits and workers' compensation claims were initiated and proceeded in parallel to maximize profit for the Defendants.

39. In order to inflate settlement value and workers' compensation benefits  and thereby effectuate higher profit for the Defendants, Gorayeb Defendants, Fogelgaren Defendants and/or others under their control, directed the Claimants to seek medical diagnosis and treatment from associated medical providers, including the Medical Provider Defendants, who provide a variety of services (radiology, physical therapy, pain management and orthopedic surgery) at facilities located in or to patients from multiple states, including New York and New Jersey.

40. Many of the Claimants are undocumented immigrants who do not speak English, and the Claimants, as part of the Fraud Scheme, were instructed to fake their injuries and to receive a myriad of healthcare services that were unnecessary, excessive, unwarranted and costly and/or not causally related to the alleged workplace accident.

41. As an incentive to attest to fraudulent accidents and injuries and to undergo unnecessary surgery, upon information and belief Claimants were offered litigation funding loans.

42. The Medical Provider Defendants provided false diagnoses, use of their facilities and resources, and unnecessary, excessive, unwarranted and costly medical services and/or medical services that were not causally related to the alleged workplace accident, for which the Medical Provider Defendants received compensation from workers' compensation insurance.

43. The Medical Provider Defendants understood and agreed that in turn for providing the false medical documentation needed for higher settlement values, the Gorayeb Defendants and the Fogelgaren Defendants will continue to funnel patients to their offices.

44. Armed with the fraudulently documented medical diagnoses and medical services allegedly related to the workplace accident, the Gorayeb Defendants fraudulently inflate the settlement values of personal injury lawsuits in order to extract greater settlement from general liability carriers, including from Plaintiff Roosevelt.

45. Similarly, the Fogelgaren Defendants fraudulently inflate the settlement values of workers' compensation claims in order to extract greater settlement from workers' compensation carriers, for which Plaintiff Tradesman provides administrative, investigative and support services.

**B.**    **Fraudulent Accident, Treatment and Claim/Lawsuit in Furtherance of Fraud Scheme**

46. The Defendants engaged in the Fraud Scheme resulting in a significant number of fraudulent claims being filed.  For example, on behalf of the Defendants and in furtherance of the Fraud Scheme, the Legal Service Defendants represented the

following individuals who staged an accident and/or to claimed injuries unrelated to the alleged accident in claims and lawsuits the Legal Service Defendants knew were fraudulent, and the Medical Provider Defendants provided unnecessary and excessive treatment unrelated to the claimed accident. The following individuals are just a fraction of the individuals who participated in the Fraud Scheme under Defendants' guidance.

    i.    <u>Claimant A</u>

47.  Claimant A was allegedly injured on April 23, 2020, while working on a construction project in New York during the COVID-19 shutdown for all non-essential construction work when he was struck by falling plywood that purportedly weighed 70 pounds.

48. Claimant A retained the Gorayeb Firm, and Gorayeb Defendants directed the aggressive and unnecessary medical treatment of Claimant A and filed a lawsuit on behalf of Claimant A alleging personal injuries and damages stemming from negligence at the construction site.

49. Although Claimant A was initially represented by a different firm, Claimant A subsequently retained the Fogelgaren Firm to represent Claimant A before the NY WCB.

50. Under the direction of Gorayeb Defendants and the care of the Medical Provider Defendants, what started out as a contusion (for which Claimant A was given a shot for pain and took over-the-counter pain reliever) became a tear of the left shoulder rotator cuff that required arthroscopy surgery and herniation that required back fusion surgery two years later. Claimant A also received a series of epidural steroid injections and 149 alleged physical therapy sessions and/or acupuncture from, among others, the NY

Ortho Defendants. Years after the April 2020 alleged injury, Merola diagnosed Claimant A as being 100% disabled from work with a "guarded" prognosis.

51. Based on Claimant A's medical and workers' compensation records, many of the medical services provided to Claimant A were unnecessary, excessive and/or unwarranted and were not causally related to the alleged workplace accident. *See* Affidavit of Geoffrey A. Negin, M.D. ("Negin Aff.") at 2-3; 6-7, attached hereto as **Exhibit 1** (opining that the cervical MRI of Claimant A does not show a herniation and none of the MRIs indicate an acute injury causally related to the alleged accident); Affidavit of Anton Y. Jorgensen, M.D. ("Jorgensen Aff.") at 2-3; 6-9, attached hereto as **Exhibit 2** (opining that the overall picture of Claimant A "is degenerative in nature and not an acute injury causally related to the accident at issue."); Affidavit of Kate Glywasky, Psy.D, ABPP ("Glywasky Aff.") at 5; 8-10, attached hereto as **Exhibit 3** ("there is nothing in the medical records to suggest that [Claimant A] incurred any mental health issues elevated above normal everyday stressors that would suggest one to conclude, in all reasonable medical probability, that he incurred any mental health damages as a result of the alleged accident."); Affidavit of Travis C. Burns, M.D., FAAOS ("Burns Aff."), at 10, attached hereto as **Exhibit 4** (opining that surgeries were not medically necessary or not an acute injury related to the alleged accident); Affidavit of Stephen Kishner, M.D. ("Kishner Aff."), at 8, attached hereto as **Exhibit 5** (opining the physical therapy sessions were excessive).

52. The Medical Provider Defendants and/or Fogelgaren Defendants on behalf of the Medical Provider Defendants electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Claimant

A, which were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

53. Based on such submission of fraudulent claim documents to the NY WCB, payments were issued by mail and/or by ACH payment directly to the Medical Provider Defendants.

54. The Fogelgaren Defendants electronically submitted such fraudulent claim documents to the NY WCB and used the fraudulent medical records and assertions to falsely bolster and add value to Claimant A's workers' compensation claim, thereby inflating settlement value and ultimately, the Fogelgaren Defendants' financial gain from Claimant A's workers' compensation claim.

55. The Gorayeb Defendants provided by mail or by electronic service to the New York Bronx County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Claimant A's construction accident, the existence of and the extent of Claimant A's injuries, and the necessity of medical treatment that Claimant A received in connection with the construction accident, in order to falsely bolster and add value to Claimant A's personal injury lawsuit, thereby inflating settlement value and ultimately, the Gorayeb Defendants' financial gain from Claimant A's personal injury lawsuit.

56. The Gorayeb Defendants provided by mail or by electronic service to defense counsel medical authorizations and HIPAA releases signed by Claimant A for the release of Claimant A's medical records that Gorayeb Defendants knew or reasonably should have known were false.

ii.    <u>Claimant B</u>

57. Claimant B was allegedly injured on February 8, 2018, while working on a construction project in Brooklyn, New York when he fell from a ladder.

58. Claimant B retained the Gorayeb Firm, and Gorayeb Defendants directed the aggressive, unnecessary medical treatment of Claimant B and filed a lawsuit on behalf of Claimant B alleging personal injuries and damages stemming from negligence at the construction site.

59. Claimant B also retained the Fogelgaren Firm to represent Claimant B before the NY WCB.

60. Initially, although some tenderness was found in the cervical, knee and lumbar areas and imaging showed some degenerative issues without acute injury or stenosis, examination of Claimant B showed no spine or contusion and no loss of consciousness, headache or dizziness. Claimant B was discharged on Ibuprofen.

61. Thereafter, under the direction of Gorayeb Defendants and/or Fogelgaren Defendants and the care of the Medical Provider Defendants, Claimant B claimed disc herniation, left shoulder and knee injuries, and ankle fracture and received a host of medical services from the Medical Provider Defendants, including imaging services, surgeries and physical therapy. Among other things, the Medical Provider Defendants assessed Claimant B as having post-traumatic cervical pain with symptoms of cervical and spinal radiculopathy, knee pain and sprain, and cervical herniations impinging on the thecal sac. Months later, the Medical Provider Defendants diagnosed Claimant B with knee meniscal tear and osteochondritis dissecans related to the alleged workplace accident and Claimant B underwent arthroscopy surgery. Weinstein referred Claimant

B to Grimm for treatment and evaluation and asked Grimm to forward a report of his findings.  Sharma performed right ankle arthroscopic surgery on Claimant B.

62. Based on Claimant B's medical and workers' compensation records, many of the medical services provided to Claimant B were unnecessary, excessive and unwarranted and were not causally related to the alleged workplace accident. *See* Negin Aff., Ex. 1, at 3-4, 9 (opining that imaging does not show herniation and ankle arthritis and inflammation wholly unrelated to the alleged accident); Jorgensen Aff., Ex. 2, at 3-4, 9-12 (opining that imaging shows degenerative issues, not causally related to the alleged accident); Glywasky Aff., Ex. 3, at 6-7, 10-11 (opining that nothing in the medical records show mental health damage as a result of the alleged accident); Burns Aff., Ex. 4, at 13 (opining that the knee tear in the medial meniscus with arthritis is degenerative in nature and not due to trauma); Kishner Aff., Ex. 5, at 12 (opining that Claimant B's conditions are wholly unrelated to the alleged accident and, in all reasonable medical probability, degenerative in nature, given Claimant B's age (late 50s) and occupation).

63. The Medical Provider Defendants and/or Fogelgaren Defendants on behalf of the Medical Provider Defendants electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Claimant B, which were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

64. Based on such submission of fraudulent claim documents to the NY WCB, payments were issued by mail and/or by ACH payment directly to the Medical Provider Defendants.

65. The Fogelgaren Defendants electronically submitted such fraudulent claim documents to the NY WCB and used the fraudulent medical records and assertions to falsely bolster and add value to Claimant B's workers' compensation claim, thereby inflating settlement value and ultimately, the Fogelgaren Defendants' financial gain from Claimant B's workers' compensation claim.

66. The Gorayeb Defendants provided by mail or by electronic service to the New York Bronx County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent medical records documents containing false assertions regarding Claimant B's construction accident, the existence of and the extent of Claimant B's injuries, and the necessity of medical treatment that Claimant B received in connection with the construction accident, in order to falsely bolster and add value to Claimant B's personal injury lawsuit, thereby inflating settlement value and ultimately, the inflating settlement value and ultimately, the Gorayeb Defendants' financial gain from Claimant B's personal injury lawsuit.

67. The Gorayeb Defendants provided by mail or by electronic service to defense counsel medical authorizations and HIPAA releases signed by Claimant B for the release of Claimant B's medical records that Gorayeb Defendants knew or reasonably should have known were false.

   iii.      Claimant C

68. Claimant C was allegedly injured on December 6, 2021, while working on a construction project in Bronx, New York when he fell from an allegedly improperly secured elevated surface.

69. Claimant C retained the Gorayeb Firm, and Gorayeb Defendants directed the aggressive, unnecessary medical treatment of Claimant C and filed a lawsuit on behalf

of Claimant C alleging personal injuries and damages stemming from negligence at the construction site.

70. Claimant C also retained the Fogelgaren Firm to represent Claimant C before the NY WCB.

71. Initially, while Claimant C complained of some pain, a CT scan of the brain and lumbar spine was within normal limits, x-rays of his left knee, chest and pelvic were negative, his psychological evaluation was normal, with no neurological numbness or weakness, and he was discharged with Tylenol for pain.

72. Thereafter, under the direction of Gorayeb Defendants and/or Fogelgaren Defendants and the care of the Medical Provider Defendants, Claimant C claimed cervical pain, shoulder pain, wrist pain, lumbar pain, knee pain, and ankle pain, and received a host of medical services from the Medical Provider Defendants, including imaging services, surgeries and physical therapy. The following year, Claimant C was diagnosed with a traumatic brain injury with loss of consciousness. More than a year after the alleged accident, in January 2023, Merola stated that Claimant C was "100% totally disabled" and falsely attributed the neck and back injuries as causally related to the accident.

73. Based on Claimant C's medical and workers' compensation records, many of the medical services provided to Claimant C were unnecessary, excessive and/or unwarranted and were not causally related to the alleged workplace accident. *See* Negin Aff., Ex. 1, at 4-5, 10-11 (opining that imaging does not show an injury as a result of the alleged accident); Jorgensen Aff., Ex. 2, at 4-5, 12-14 (opining that imaging shows a normal healthy spine in a young 20-year old male and do not indicate any trauma); Glywasky Aff., Ex. 3, at 7, 11-17 (opining that nothing in the medical records show

traumatic brain injury as a result of the alleged accident); Kishner Aff., Ex. 5, at 13-14 (opining that there was no reason for all 43 physical therapy visits); Affidavit of Stephen L. Nelson, M.D. PhD ("Nelson Aff."), at 6, 11, attached hereto as **Exhibit 6** (opining that there is no evidence of any cognitive or neuropsychologic injury as a result of the alleged accident).

74. The Medical Provider Defendants and/or Fogelgaren Defendants on behalf of the Medical Provider Defendants electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Claimant C, which were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

75. Based on such submission of fraudulent claim documents to the NY WCB, payments were issued by mail and/or by ACH payment directly to the Medical Provider Defendants.

76. The Fogelgaren Defendants electronically submitted such fraudulent claim documents to the NY WCB and used the fraudulent medical records and assertions to falsely bolster and add value to Claimant C's workers' compensation claim, thereby inflating settlement value and ultimately, the Fogelgaren Defendants' financial gain from Claimant C's workers' compensation claim.

77. The Gorayeb Defendants provided by mail or by electronic service to the New York Bronx County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent medical records documents containing false assertions regarding Claimant B's construction accident, the existence of and the extent of Claimant B's injuries, and the necessity of medical treatment that Claimant B received in connection with the

construction accident, in order to falsely bolster and add value to Claimant C's personal injury lawsuit, thereby inflating settlement value and ultimately, the Gorayeb Defendants' financial gain from Claimant C's personal injury lawsuit.

78. The Gorayeb Defendants provided by mail or by electronic service to defense counsel medical authorizations and HIPAA releases signed by Claimant C for the release of Claimant C's medical records that Gorayeb Defendants knew or reasonably should have known were false.

   iv.      <u>Claimant D</u>

79. Claimant D was allegedly injured on October 29, 2021, while working on a construction project in Bronx, New York when a metal beam purportedly fell from a third floor of the construction site and hit Claimant D's right arm. Claimant D returned to work after the alleged accident and continued working for about a month.

80. Claimant D retained the Gorayeb Firm, and Gorayeb Defendants directed the aggressive, unnecessary medical treatment of Claimant D and filed a lawsuit on behalf of Claimant D alleging personal injuries and damages stemming from negligence at the construction site.

81. Claimant D also retained the Fogelgaren Firm to represent Claimant D before the NY WCB.

82. Initially, Claimant D had complained of arm pain, but his x-rays demonstrated no fractures. Claimant D was given pain medication and discharged.

83. Thereafter, under the direction of Gorayeb Defendants and/or Fogelgaren Defendants and the care of the Medical Provider Defendants, Claimant C was diagnosed with a tear of the common flexor tendon and herniation. Two years after the alleged injury, Claimant D underwent cervical fusion at SA5 for the alleged disc herniation.

84. Based on Claimant D's medical and workers' compensation records, many of the medical services provided to Claimant D were unnecessary, excessive, and/or unwarranted and were not causally related to the alleged workplace accident. *See* Negin Aff., Ex. 1, at 5-6, 11-13 (opining that imaging does not demonstrate tear of the common flexor tendon, but rather shows thickening and tendonitis that in all reasonable medical probability is pre-existing, and that imaging shows degenerative issues with lumbar spine and no herniation); Jorgensen Aff., Ex. 2, at 5-6, 14-16 (opining that MRI taken of Claimant D's shoulder "does not show a partial tear and appears to be a total fabrication of such injury"); Glywasky Aff., Ex. 3, at 7-8, 17 (opining that nothing in the medical records show any cognitive or neuropsychologic injury as a result of the alleged accident); Burns Aff., Ex. 4, at 15-16 (opining that imaging showed degenerative issues unrelated to the alleged accident and that there was no evidence of acute tendon tear).

85. The Medical Provider Defendants and/or Fogelgaren Defendants on behalf of the Medical Provider Defendants electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Claimant D, which were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

86. Based on such submission of fraudulent claim documents to the NY WCB, payments were issued by mail and/or by ACH payment directly to the Medical Provider Defendants.

87. The Fogelgaren Defendants electronically submitted such fraudulent claim documents to the NY WCB and used the fraudulent medical records and assertions to falsely

bolster and add value to Claimant D's workers' compensation claim, thereby inflating settlement value and ultimately, the Fogelgaren Defendants' financial gain from Claimant D's workers' compensation claim.

88. The Gorayeb Defendants provided by mail or by electronic service to the New York Bronx County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent medical records documents containing false assertions regarding Claimant B's construction accident, the existence of and the extent of Claimant B's injuries, and the necessity of medical treatment that Claimant B received in connection with the construction accident, in order to falsely bolster and add value to Claimant D's personal injury lawsuit, thereby inflating settlement value and ultimately, the Gorayeb Defendants' financial gain from Claimant D's personal injury lawsuit.

89. The Gorayeb Defendants provided by mail or by electronic service to defense counsel medical authorizations and HIPAA releases signed by Claimant D for the release of Claimant D's medical records that Gorayeb Defendants knew or reasonably should have known were false.

## C.     Defendants' Participation in the Fraud Scheme

90. At all relevant times, the Defendants constituted an association-in-fact enterprise and were engaged in, and the activities of which affected, interstate commerce, and each of the Defendants participated in the operation or management of the enterprise.

i.     Gorayeb Defendants' Participation in the Fraud Scheme

91. Since 2018, the Gorayeb Firm has been involved in hundreds of lawsuits involving purported construction work injuries, covered by various insurers and reinsurers, including Plaintiff Roosevelt as well as those serviced by Plaintiff Tradesman, in furtherance of the Fraud Scheme.

92. Defendant Gorayeb is the sole shareholder and principal of the Gorayeb Firm.

93. At all times relevant, Gorayeb Defendants sponsored, directed, authorized, coordinated, and controlled the conduct engaged in by the Runners to give OSHA training to construction workers and to recruit construction workers (*i.e.*, Claimants) to stage workplace accidents and/or falsely claim injuries unrelated to the alleged accidents.

94. At all relevant times, Gorayeb Defendants represented Claimants in personal injury lawsuits and directed, authorized, coordinated, and controlled the prosecution of Claimants' lawsuits, assigning duties and responsibilities to attorneys/employees of the Gorayeb Firm, and intentionally submitting or causing the filing of and submission of fraudulent assertions and medical documentation to various courts within the State of New York and all named parties in the personal injury lawsuit.

95. As part of the Fraud Scheme, the Gorayeb Defendants referred the Claimants to the Fogelgaren Defendants for representation and prosecution of the Claimants' workers' compensation claims.

96. Gorayeb Defendants directed the Claimants to seek medical treatment from the Medical Provider Defendants, knowing and understanding that the Medical Provider Defendants would provide fraudulent medical documentation needed for higher settlement values in exchange for continuing to funnel patients to the Medical Provider Defendants.

97. Each of Gorayeb Defendants knowingly transmitted and received by mail, facsimile, and/or email documents that contained assertions of legitimate construction accidents,

the existence of injuries, and the necessity of medical treatment that Gorayeb Defendants knew or reasonably should have known were false.

98. This unlawful conduct worked to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating settlement value and ultimately, Gorayeb Defendants' financial gain from the lawsuits.

ii.     Fogelgaren Defendants' Participation in the Fraud Scheme

99. Since 2018, the Fogelgaren Firm has been involved in hundreds of lawsuits involving purported construction work injuries, covered by various insurers and reinsurers, including Plaintiff Roosevelt as well as those serviced by Plaintiff Tradesman, in furtherance of the Fraud Scheme.

100.    Defendants Fogelgaren, Forman and Bergman are the named principals of the Fogelgaren Firm.

101.    At all relevant times, Fogelgaren Defendants represented Claimants in personal workers' compensation claims and directed, authorized, coordinated, and controlled the prosecution of Claimants' claims, assigning duties and responsibilities to attorneys/employees of the Fogelgaren Firm, and intentionally submitting or causing the filing of and submission of fraudulent assertions and medical documentation to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims.

102.    Fogelgaren Defendants directed the Claimants to seek medical treatment from the Medical Provider Defendants, knowing and understanding that the Medical Provider Defendants would provide fraudulent medical documentation needed for higher settlement values in exchange for continuing to funnel patients to the Medical Provider Defendants.

103.   Based on such fraudulent medical documentation submitted to the NY WCB, payments were issued by mail and/or by ACH payment to the Fogelgaren Firm for distribution to the Claimants.

104.   Each of Fogelgaren Defendants knowingly transmitted and received by mail, facsimile, and/or email documents that contained assertions of legitimate construction accidents, the existence of injuries, and the necessity of medical treatment that Fogelgaren Defendants knew or reasonably should have known were false.

105.   This unlawful conduct worked to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating settlement value and ultimately, Fogelgaren Defendants' financial gain from the workers' compensation claims.

   iii.      NY Ortho Defendants' Participation in the Fraud Scheme

106.   Since 2018, the NY Ortho has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

107.   Kaplan, as an orthopedic surgeon and a principal of NY Ortho, controlled and directed the medical services provided to Claimants by NY Ortho, including a) evaluating and performing surgeries that were not medically necessary and/or not causally related to the alleged accidents; b) referring Claimants to his colleagues, Grimm and Puia, also of NY Ortho, for unnecessary injections and physical therapy; and c) referring Claimants to Kolb Defendants for unnecessary imaging services.

108.   Grimm, as a physician specializing in physical medicine and rehabilitation and pain management, and upon information and belief, a principal of NY Ortho, controlled and directed the medical services provided to Claimants by NY Ortho, including a)

evaluating and providing injections that were not medically necessary and/or not causally related to the alleged accidents; and b) referring Claimants to his colleague, Puia, for unnecessary physical therapy.

109.    Puia, as a registered physical therapist with NY Ortho, controlled and directed the medical services provided to Claimants by NY Ortho, including evaluating and providing physical therapy sessions.

110.    As part of the Fraud Scheme, Kaplan, Grimm and Puia intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

111.    As part of the Fraud Scheme, Kaplan, Grimm and Puia provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

112.    As part of the Fraud Scheme, Kaplan, Grimm and Puia provided fraudulent medical documentation by mail, facsimile and/or email to Gorayeb Defendants and/or Fogelgaren Defendants, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

113.    The NY Ortho Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Kaplan, Grimm and Puia, that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident but were rendered in furtherance of the Fraud Scheme.

114.    The NY Ortho Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Kaplan, Grimm and Puia provided medical and diagnostic services and received reimbursement for such services.

    iv.    <u>Kolb Defendants' Participation in the Fraud Scheme</u>

115.    Since 2018, Kolb Practice has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

116.    Kolb, as a radiologist and a principal of Kolb Practice, controlled and directed the medical services provided to Claimants by providing radiological and imaging diagnostics and MRI reports identifying purported positive findings without correlation to degenerative conditions and providing inaccurate findings of the Claimants' conditions.

117.    As part of the Fraud Scheme, Kolb intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

118.   As part of the Fraud Scheme, Kolb provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

119.   As part of the Fraud Scheme, Kolb provided fraudulent medical documentation by mail, facsimile and/or email to Gorayeb Defendants and/or Fogelgaren Defendants, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

120.   The Kolb Defendants knowingly profited from reimbursements for the alleged imaging and diagnostic services rendered by Kolb, that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident but were rendered in furtherance of the Fraud Scheme.

121.   The Kolb Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Kolb provided imaging and diagnostic services and received reimbursement for such services.

   v.   Lenox Practice Participation in the Fraud Scheme

122.   Since 2018, the Lenox Practice has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

123.   The Lenox Practice, as radiologists, controlled and directed the medical services provided to Claimants by providing radiological and imaging diagnostics and MRI

reports identifying purported positive findings without correlation to degenerative conditions and providing inaccurate findings of the Claimants' conditions.

124.   As part of the Fraud Scheme, the Lenox Practice intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

125.   As part of the Fraud Scheme, the Lenox Practice provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

126.   As part of the Fraud Scheme, the Lenox Practice provided fraudulent medical documentation by mail, facsimile and/or email to Gorayeb Defendants and/or Fogelgaren Defendants, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

127.   The Lenox Practice knowingly profited from reimbursements for the alleged imaging and diagnostic services rendered by the Lenox Practice, that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident but were rendered in furtherance of the Fraud Scheme.

128.    The Lenox Practice also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom they provided imaging and diagnostic services and received reimbursement for such services.

      vi.    <u>Weinstein Defendants' Participation in the Fraud Scheme</u>

129.    Since 2018, the Weinstein Practice has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

130.    Weinstein, as an orthopedic surgeon and a principal of the Weinstein Practice, controlled and directed the medical services provided to Claimants by the Weinstein Practice, including evaluating and performing surgeries that were not medically necessary and/or not causally related to the alleged accidents.

131.    As part of the Fraud Scheme, Weinstein intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

132.    As part of the Fraud Scheme, Weinstein provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

133.    As part of the Fraud Scheme, Weinstein provided fraudulent medical documentation by mail, facsimile and/or email to Gorayeb Defendants and/or

Fogelgaren Defendants, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

134.   The Weinstein Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Weinstein, that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident but were rendered in furtherance of the Fraud Scheme.

135.   The Weinstein Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Weinstein provided medical and diagnostic services and received reimbursement for such services.

   vii.   Merola's Participation in the Fraud Scheme

136.   Since 2018, Merola has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

137.   Merola, as an orthopedic surgeon, controlled and directed the medical services provided to Claimants, including evaluating and performing surgeries that were not medically necessary and/or not causally related to the alleged accidents.

138.   As part of the Fraud Scheme, Merola intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were

unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

139.    As part of the Fraud Scheme, Merola provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

140.    As part of the Fraud Scheme, Merola provided fraudulent medical documentation by mail, facsimile and/or email to Gorayeb Defendants and/or Fogelgaren Defendants, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

141.    Merola knowingly profited from reimbursements for the alleged medical and diagnostic services that he rendered, that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident but were rendered in furtherance of the Fraud Scheme.

142.    Merola also knowingly profited from the increased number of patients who were referred to him as part of the Fraud Scheme, for whom he provided medical and diagnostic services and received reimbursement for such services.

viii.    <u>SOW's Participation in the Fraud Scheme</u>

143.    Since 2018, SOW has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

144.    SOW is an ambulatory surgical center with a statutory duty, *inter alia*, to ensure that all surgical procedures are performed in accordance with current standards of professional practice and that there are reviews of the appropriateness and necessity of procedures performed.  *See* New York Code of Rules and Regulations, Title 10, Part 755.3(b) and 755.9.

145.    SOW, as an ambulatory surgical center, controlled and directed its facility where it contributed resources to other Medical Provider Defendants who it knew or should have known provided treatment to Claimants, including performing surgeries that were not medically necessary and/or not causally related to the alleged accidents.

146.    As part of the Fraud Scheme, SOW intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

147.    As part of the Fraud Scheme, SOW provided fraudulent medical documentation by mail, facsimile and/or email to medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

148.    As part of the Fraud Scheme, SOW provided fraudulent medical documentation by mail, facsimile and/or email to Gorayeb Defendants and/or Fogelgaren Defendants, knowing that the fraudulent medical documentation would be used to falsely bolster

and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

149.    SOW knowingly profited from reimbursements for the alleged medical services rendered, that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident but were rendered in furtherance of the Fraud Scheme.

150.    SOW also knowingly profited from the increased number of patients who were treated there as part of the Fraud Scheme, for whom they provided medical services and received reimbursement for such services.

    ix.      <u>Sharma's Participation in the Fraud Scheme</u>

151.    Since 2018, Sharma has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

152.    Sharma, as an orthopedic surgeon, controlled and directed the medical services provided to Claimants, including evaluating and performing surgeries that were not medically necessary and/or not causally related to the alleged accidents.

153.    As part of the Fraud Scheme, Sharma intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

154.    As part of the Fraud Scheme, Sharma provided fraudulent medical documentation by mail, facsimile and/or email to medical service providers knowing that the

fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

155.    As part of the Fraud Scheme, Sharma provided fraudulent medical documentation by mail, facsimile and/or email to Gorayeb Defendants and/or Fogelgaren Defendants, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

156.    Sharma knowingly profited from reimbursements for the alleged medical and diagnostic services rendered, that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident but were rendered in furtherance of the Fraud Scheme.

157.    Sharma knowingly profited from the increased number of patients who were treated there as part of the Fraud Scheme, for whom they provided medical and diagnostic services and received reimbursement for such services.

    x.      S5A's Participation in the Fraud Scheme

158.    Since 2018, S5A has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

159.    S5A is an ambulatory surgical center with a statutory duty, *inter alia*, to ensure that all surgical procedures are performed in accordance with current standards of professional practice and that there are reviews of the appropriateness and necessity of procedures performed. *See* New York Code of Rules and Regulations, Title 10, Part 755.3(b) and 755.9.

160. S5A, as an ambulatory surgical center, controlled and directed its facility where it contributed resources to other Medical Provider Defendants who it knew or should have known provided treatment to Claimants, including performing surgeries that were not medically necessary and/or not causally related to the alleged accidents.

161. As part of the Fraud Scheme, S5A intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

162. As part of the Fraud Scheme, S5A provided fraudulent medical documentation by mail, facsimile and/or email to medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

163. As part of the Fraud Scheme, S5A provided fraudulent medical documentation by mail, facsimile and/or email to Gorayeb Defendants and/or Fogelgaren Defendants, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

164. S5A knowingly profited from reimbursements for the alleged medical services rendered, that were unnecessary, excessive, unwarranted and/or costly and were not

causally related to the alleged workplace accident but were rendered in furtherance of the Fraud Scheme.

165.    S5A also knowingly profited from the increased number of patients who were treated there as part of the Fraud Scheme, for whom they provided medical services and received reimbursement for such services.

### D.    **Defendants' Pattern of Racketeering Activity**

166.    The pattern of racketeering engaged in by Defendants involving a scheme to defraud and steal from Plaintiffs and others, began on or before 2018, and continues to the present day, and includes among others: *See* Pattern of Racketeering Activity – Predicate Acts, attached hereto as **Exhibit 7**.

## IV.    **PLAINTIFFS' JUSTIFIABLE RELIANCE**

167.    Tradesman is under a statutory obligation to promptly and fairly pay or object to will within 45 days. *See* New York Workers' Compensation § 13-5(1).

168.    The invoices and documentation supporting the Fraud Scheme submitted to Tradesman, the New York State Workers' Compensation Board, the New York Unified Court System, and others contained materially false statements and were designed to conceal materially false statements.

169.    As such, Tradesman justifiably and reasonably relied on them as facially valid.

## V.    **DAMAGES**

170.    Plaintiff Roosevelt is a reinsurer which underwrites policies and provides reinsurance that covers the various workers' compensation claims and personal injury lawsuits filed and prosecuted by the Legal Service Defendants as part of the Fraud Scheme. As such, Roosevelt is a party directly and ultimately damaged by the Fraud Scheme.

171.    Due to Defendants' perpetration of the Fraud Scheme, Roosevelt has incurred expenses paid as reimbursement to primary insurers providing coverage for the claims and lawsuits filed and/or prosecuted by the Legal Defendants on behalf of Claimants.

172.    But for Defendants' perpetration of the Fraud Scheme, Roosevelt's expenses paid as reimbursement to primary insurers would be less because the Claimants' injuries, if any, would be less severe and the medical services necessary to treat any accident-related injury, if any, would less significant, resulting in lower settlement value of such claims and lawsuits and thus, less litigation expenses.

173.    Due to Defendants' perpetration of the Fraud Scheme, Roosevelt has incurred general liability claim adjustment expenses progressively rising from $14,020,890.00 in 2018 to $36,362,147.00 in 2019 (159% increase from 2018), to $58,694,694.00 in 2020 (61% increase from 2019), to $91,334,395.00 in 2021 (56% increase from 2020), and to $142,127,559.00 in 2022 (56% increase from 2021 and 914% increase in four years).

174.    Between 2021 and 2022 alone, Roosevelt's net outstanding liability under general liability reinsurance increased from $81,267,474.00 to $119,069,641.00, an increase of nearly 47% notwithstanding the COVID-19 pandemic during 2020, which led to the single largest one-year decline for the construction industry in New York City since 1990. *See* Office of the New York State Comptroller, "The Construction Industry in New York City: Recent Trends and Impact of COVID-19," March 3, 2022, at 3. *See* https://www.osc.ny.gov/files/reports/osdc/pdf/report-3-2021.pdf, incorporated herein by reference, last accessed February 15, 2024.

175.    The drastically escalating cost of construction-related claims in both the Workers' Compensation and general liability areas stands in marked contrast to the overall decreasing number of workplace injuries, which in New York City reportedly decreased from 759 in 2018 to 554 in 2022 (a 27% decrease). *See e.g.*, "2022 New York City Construction Safety Report," at https://www.nyc.gov/assets/buildings/pdf/con_safe_2022.pdf, incorporated herein by reference, last accessed February 15, 2024. The number of workplace incidents decreased from 1,193 in 2018 to 751 in 2022, a 37% decrease. *Id.*

176.    In an April 2024 study, the New York Civil Justice Institute indicated that insurance costs in New York are higher than any other state and that insurance professionals warn that the market is headed toward a crisis that will have long term implications for consumers." *See https://acrobat.adobe.com/id/urn:aaid:sc:us:2de7b5f8-2913-4ed4-8ec4-625d1ca07466,* incorporated herein by reference, last accesses August 5, 2024.

177.    The study goes on to say that construction insurance costs are the highest when compared to nearby states such as Connecticut, New Jersey and Pennsylvania at a rate of 12.5% of a project's costs versus 2.5%, respectively. *Id.*

178.    Further, the study cites information that an average Labor Law 240(1) claim will settle for above $1 million, however, if there is a neck or back surgery involved, the claim value averages between $2 million to $3 million or more. *Id.*

179.    In the face of fraudulent insurance claims, much like the defendants' Fraud Scheme, the New York Legislature has introduced a bill making the staging of a construction accident and the encouraging and assisting the same, a Class E Felony in the State of New York. That bill is currently pending.

180.  Plaintiff Tradesman serves as a management general agency that provides management services to various insurers and reinsurers, including Plaintiff Roosevelt, including general liability and workers' compensation services from underwriting through claims handling and subsequent administrative and legal actions, specifically focusing on safety management and effective handling of claims within the construction industry.

181.  Tradesman made substantial payments and sustained significant damage in connection with its management of the policies that cover the various claims and lawsuits filed and prosecuted by the Legal Service Defendants as part of the Fraud Scheme.

182.  Due to Defendants' perpetration of the Fraud Scheme, numerous insurance carriers have ceased to write Workers' Compensation and/or general liability policies in the State of New York, which has resulted in damage to Tradesman's business.

183.  Defendants' patterns of fraudulent conduct caused injury to Plaintiffs in their business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Plaintiffs to calculate damages with specificity at this stage in the litigation (whereas Plaintiff's damages continue to accrue), Plaintiffs' injuries include, but are not limited to the following:

a.  Plaintiff Roosevelt – Actual and consequential damages for the payments such Plaintiff made as reimbursement for payments made directly to the Defendants or to others due to Defendants' pattern of fraudulent conduct in connection with claims made under New York's Workers' Compensation

Laws and New York's Labor Laws, the exact amount to be determined at trial.

b.   Plaintiff Tradesman – Actual and consequential damages for the damage to Tradesman business including, but not limited to, expenses incurred for the administration of these claims and the retention of additional staff to perform investigative and support services for claims wherein the Defendants are submitting or causing to be submitted claims/demands for monetary payments in connection with New York's Workers' Compensation Law and New York's Labor Laws, the exact amount to be determined at trial.

## VI.   CAUSES OF ACTION

### COUNT I
### RICO Violation (§ 1962(c))

184.   Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

185.   At all times relevant herein, Defendants constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) – that is, a group of individuals and legal entities associated in fact, which was engaged in, and the activities of which affected, interstate commerce, and foreign commerce. Each of the Defendants participated in the operation or management of the enterprise, which Gorayeb orchestrated, coordinated and led.

186.   In addition to any legitimate transactions, the course of conduct of this enterprise included a pattern of racketeering activity carried out by Defendants. *See* Exhibit 7.

187.   Each of the Defendants knowingly and willfully associated with the association-in-fact enterprise and conducted and participated in the conduct of the enterprise's affairs,

directly and indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

188.    The pattern of racketeering activity in which the Defendants engaged involved numerous specific acts and conducts as described in detail in this Complaint and the accompanying exhibits, constituting mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343) and bribing a witness under New York law (NY Penal Code § 215) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

189.    The predicate acts of mail fraud, wire fraud, and bribing a witness or victim involved the transmission and use of false and misleading documentation in furtherance of the Defendants' scheme to defraud Plaintiffs in connection with submitting, filing, prosecuting and asserting workers' compensation claims and personal injury lawsuits arising out of fraudulent construction accidents.

190.    As a result of the pattern of racketeering activity, Plaintiffs have suffered damage to their business and property.

WHEREFORE, Plaintiffs demand judgment against the Defendants, and each of them, jointly and severally, for:

a.    An award of Plaintiffs' actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

b.    Plaintiffs' reasonable attorneys' fees, expenses, costs, and interest;

c.    Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and

d.    Such other relief as the Court deems just and proper.

## COUNT II
## RICO Violation (§ 1962(d))

191.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

192.    From at least 2018 to the present, Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity set forth herein in violation of 18 U.S.C. § 1962(d).

193.    The pattern of racketeering activity in which the Defendants intentionally combined to engage in or otherwise conspired to engage in involved numerous specific acts and conducts as described in detail in this Complaint and the accompanying exhibits, constituting mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343) and bribing a witness under New York law (NY Penal Code § 215) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

194.    The predicate acts of mail fraud, wire fraud, and bribing a witness or victim also involved the transmission and use of false and misleading documentation in furtherance of the Defendants' scheme to defraud Plaintiffs in connection with submitting, filing, prosecuting and asserting workers' compensation claims and personal injury lawsuits arising out of fraudulent construction accidents.

195.    As a result of the pattern of racketeering activity, Plaintiffs have suffered damage to their business and property.

WHEREFORE, Plaintiffs demand judgment against the Defendants, and each of them, jointly and severally, for:

a.    An award of Plaintiffs' actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

b.    Plaintiffs' reasonable attorneys' fees, expenses, costs, and interest;

c.    Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and

d.    Such other relief as the Court deems just and proper.

## COUNT III
## Common Law Fraud

196.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

197.    Defendants made misrepresentations of facts, deliberately concealed, omitted materials facts that they had a duty to disclose in connection with their claims for reimbursement and/or payment under New York law.

198.    These misrepresentations of fact by Defendants included, but were not limited to, the material misrepresentations of fact made in asserting the legitimacy of accidents, the existence of injuries and the necessity of treatment.

199.    Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

200.    Defendants made these misrepresentations in furtherance of the scheme to defraud Plaintiffs by submitting claims for payment of workers' compensation and general liability insurance benefits.

201.    Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Plaintiffs to make payments for claims that were not legitimate.

202.    Plaintiffs reasonably and justifiably relied, to their detriment, on the truthfulness of Defendants' representations concerning their eligibility to receive payments of workers' compensation and general liability insurance benefits, and without knowledge of Defendants' scheme and artifice to defraud them.

203.    Defendants knew, or should have known, that Plaintiffs would so rely on and intended that they so rely on their truthfulness.

204.    But for the Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct, Plaintiffs would not have paid workers' compensation and general liability insurance benefits.

205.    Plaintiffs at no time knew or had reason to know in the exercise of due diligence or reasonable care that Defendants were engaged in misrepresentations, omissions, and fraudulent conduct.

206.    As a direct and proximate cause of Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct by Defendants, Plaintiffs have been damaged. Plaintiffs' damages include, but are not necessarily limited to, benefit payments, administration costs, investigative and defense costs paid by Plaintiffs to Defendants or caused by Defendants.

207.    Because Defendants' conduct was knowing, intentional, willful, wanton, and reckless, Plaintiffs are entitled to an award of punitive damages.

WHEREFORE, Plaintiffs demand judgment against the Defendants, and each of them, jointly and severally, for:

        a.    An award of Plaintiffs' actual and consequential damages to be established at trial;

      b.     Plaintiffs' costs, including, but not limited to, investigative costs incurred in the detection of Defendant's illegal conduct; and

      c.     Such other relief as the Court deems just and proper.

<div align="center">

**Count IV**
**Unjust Enrichment**

</div>

208.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

209.    As described above, Defendants conspired to induce Plaintiffs to make or expend numerous and substantial payments to them or others.

210.    The Defendants were never eligible to make claims or seek reimbursement under New York law because, at all relevant times, the accidents, injuries and treatment were fraudulent.

211.    When Plaintiffs paid Defendants and others, Plaintiffs reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Defendants, or those persons working under their control, made concerning Defendants' eligibility to make claims or seek reimbursement under New York law.

212.    Each and every payment that Plaintiffs made or was caused to make to Defendants and others during the course of the Fraud Scheme constitutes a benefit that the Defendants sought and voluntarily accepted.

213.    Throughout the course of their scheme, Defendants wrongfully obtained from Plaintiffs benefit payments as a direct and proximate result of the unlawful conduct detailed above.

214.    Retention of those benefits by Defendants would violate fundamental principles of justice, equity, and good conscience.

WHEREFORE, Plaintiffs demand judgment against the Defendants, and each of them, jointly and severally, for:

     a.    An award of Plaintiffs' actual and consequential damages to be established at trial; and

     b.    Such other relief as the Court deems just and proper.

**<u>Count V</u>**
**<u>Declaratory Relief Pursuant to 28 U.S.C. § 2201</u>**

215.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

216.    Pursuant to 18 U.S.C. § 2201(a), the Court may determine the rights and legal obligations of the parties.

217.    There is an actual case and controversy between Plaintiffs on the one hand, and Defendants on the other hand, as to all charges for examinations, treatments, testing, injections, surgeries, and physical therapy that have not been paid to date and through the pendency of this litigation. Plaintiffs contend these Defendants are not entitled to reimbursement for any of these charges.

218.    Because these Defendants have made false and fraudulent statements and otherwise engaged in the fraudulent conduct described above with the intent to conceal, mislead and misrepresent material facts and circumstances regarding each claim submitted, these Defendants are not entitled to any reimbursement for alleged services relating to any of the claims at issue.

WHEREFORE, Plaintiffs demand judgment against Defendants for:

a.      A declaration that Defendants, at all times relevant, have submitted claims and bills to Plaintiffs for staged accidents and unnecessary healthcare services in violation of New York law;

b.      Declare that Defendants' activities are unlawful;

c.      Declare that Plaintiffs have no obligation to pay any pending, previously-denied, and/or future workers' compensation or general liability insurance claims submitted by the Defendants; and

d.      Such other relief as the Court deems just and proper.

## VII.   JURY TRIAL DEMAND

219.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims.

Dated: August 7, 2024

Respectfully submitted,

**THE WILLIS LAW GROUP, PLLC**

By: /s/ William J. Clay
    **WILLIAM J. CLAY** *(admitted pro hac)*
    **MICHAEL A. GRAVES**
    **AARON E. MEYER**
    **KIRK D. WILLIS** *(admitted pro hac)*
    1985 Forest Lane
    Garland, Texas 75042
    Telephone:  214-736-9433
    Facsimile:  214-736-9994
    Service Email: service@thewillislawgroup.com

    *ATTORNEYS FOR THE PLAINTIFFS*
    ROOSEVELT ROAD RE, LTD. AND
    TRADESMAN PROGRAM MANAGERS, LLC